BARRETT S. LITT, SBN 45527
blitt@kmbllaw.com
DAVID S. McLANE, SBN 124952
dmclane@kmbllaw.com
LINDSAY BATTLES, SBN 262282
lbattles@kmbllaw.com
KAYE, MCLANE, BEDNARSKI & LITT
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7600
Facsimile: (626) 844-7670

MELISSA GOODMAN, SBN 289464
MGoodman@aclusocal.org
BRENDAN M. HAMME, SBN 285293
BHamme@aclusocal.org
PETER J. ELIASBERG, SBN 189110
PEliasberg@aclusocal.org
AMANDA C. GOAD, SBN 297131
AGoad@aclusocal.org
ADITI FRUITWALA, SBN 300362
AFruitwala@aclusocal.org
ACLU Foundation of Southern CA
1313 West 8th Street
Los Angeles, California 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5299

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| DAN MCKIBBEN, et al., | Case No.14-2171-JGB-SP |
|---|---|
| Plaintiffs, | [Hon. Jesus G. Bernal] |
| vs. | **NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; [PROPOSED] ORDER; DECLARATIONS AND EXHIBITS** |
| JOHN MCMAHON, et al., | |
| Defendants. | |
| | **Date:** _____ , 2018 <br> **Time:** \_\_\_\_9:00 A.M.\_ <br> **Place:** Courtroom 1\_\_ |

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on _____, 2018, at 9:00 a.m., or as soon thereafter as this matter may be heard in Courtroom 1 of the above-entitled Court, located at 3470 Twelfth Street, Riverside, CA 92501-3801, Plaintiffs will, and hereby do, move the Court to preliminarily approve the proposed settlement in this case, and to authorize the mailing and other forms of notice to class members.

This motion is unopposed and is based on the accompanying Memorandum of Law, the stipulation of all parties to entry of the proposed Preliminary Approval Order, the proposed Preliminary Approval Order and exhibits thereto filed concurrently, the files and records in this case, and on such further evidence as may be presented at a hearing on the motion.

DATED: August 13, 2018          Respectfully submitted,

Kaye, McLane, Bednarski & Litt, LLP
ACLU Foundation Of Southern California

By: /s/ Barrett S. Litt
      Barrett S. Litt
      Attorneys for Plaintiffs

i

# <u>TABLE OF CONTENTS</u>

**I.     INTRODUCTION** ...................................................................................1

**II.    TERMS OF THE SETTLEMENT** ........................................................2

**III.   THE STANDARDS FOR ENTRY OF THE PRELIMINARY
        APPROVAL ORDER HAVE BEEN MET** .............................................7

**IV.    CONCLUSION** ..................................................................................16

# <u>TABLE OF AUTHORITIES</u>

## Federal Cases

*City of Riverside v. Rivera*
  477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) ................................ 13, 14

*Cotter v. Lyft, Inc.*
  176 F. Supp. 3d 930 (N.D. Cal. 2016)..........................................................7, 15

*Glass v. UBS Fin. Servs., Inc.*
  2007 WL 221862 (N.D. Cal. Jan.26, 2007) ....................................................... 12

*In re High–Tech Emp. Antitrust Litig.*
  No. 11–CV–02509–LHK, 2014 WL 3917126 (N.D.Cal. Aug. 8,
  2014)..................................................................................................................7, 8

*Nielson v. Sports Auth.*
  No. C–11–4724–SBA, 2012 WL 5941614 (N.D. Cal. Nov. 27,
  2012)......................................................................................................................8

*Quesada v. Thomason*
  850 F.2d 537 (9th Cir. 1988) ............................................................................. 14

*Rodriguez v. W. Publ'g Corp.*
  563 F.3d 948 (9th Cir. 2009) ............................................................................. 12

*Staton v. Boeing Co.*
  327 F.3d 938 (9th Cir. 2003) ...................................................................9, 11, 12

*Van Vranken v. Atlantic Richfield Co.*
  901 F.Supp. 294 (N.D. Cal.1995).......................................................................12

*Weeks v. Kellogg Co.*
  No. CV 09-08102 MMM RZX, 2013 WL 6531177 (C.D. Cal. Nov.
  23, 2013) ............................................................................................................ 12

## State Cases

*Hardy v. Stumpf*
  21 Cal. 3d 1 (2008) ............................................................................................ 15

*In re Marriage Cases*
  43 Cal. 4th 757, 183 P.3d 384 (2008) ............................................................... 15

*Molar v. Gates*
    98 Cal. App. 3d 1 (Cal. Ct. App.1979).................................................. 15

*Woods v. Horton*
    167 Cal. App. 4th 658 (2008) ............................................................. 15

**Federal Statutes**

42 U.S.C. § 1988......................................................................... 5, 14

Prison Rape Elimination Act ...................................................... 15

**State Statutes**

Cal. Gov. Code § 11135(e) ........................................................ 16

Cal. Gov. Code § 12926(r)(C)(2) .............................................. 16

Cal. Penal Code § 11410(b)(3) .................................................. 16

California Civil Code § 52.1 ...................................................... 16

California Civil Code § 52.1(h).................................................... 5

**Rules**

Rule 23(b)(2) ................................................................................ 6

Rule 23(b)(3) ................................................................................ 6

Rule 23(e) ...................................................................................... 7

**Other Authorities**

*Newberg on Class Actions* § 13:13 (5th ed.) ........................... 9

## MEMORANDUM OF POINTS & AUTHORITIES

## I.   INTRODUCTION

Plaintiffs are former or current (at the time of the filing of the complaint) inmates of jails operated by the San Bernardino County Sheriff's Department (hereafter "SBCSD"). SBCSD maintained and maintains an "Alternative Lifestyle Tank" (hereafter "ALT") at the West Valley Detention Center (hereafter "WVDC"), which houses inmates who self-identify as gay, bisexual, and/or transgender (hereinafter "GBT inmates").  The WVDC is the only SBCSD jail facility that houses self-identified GBT inmates who were assigned male at birth.

Plaintiffs, and the classes they represent, contend that Defendants have engaged in systematic discrimination and denial of equal treatment against GBT inmates at the WVDC. Plaintiffs contend, inter alia, that GBT inmates 1) were automatically placed in the ALT if they self-identified as GBT; 2) would have been at risk for their safety if admitted to the general population as openly GBT inmates because SBCSD did not have any means or programs to ensure their safety; 3) had no or inadequate PREA programs in place to protect GBT inmates or address particular vulnerabilities of GBT inmates placed in the general population; 4) were limited in their time-out-of-cell generally to an hour and a half per day, and often less, in contrast to similarly situated (by classification or sentencing status) general population inmates; 5) were denied the same work opportunities that were provided to similarly situated (by classification or sentencing status) general population inmates; 6) were denied the same programming opportunities[1] that were provided to similarly situated (by classification or sentencing status) general population inmates; and 7) a comparable range of religious services to those

---

[1] Programming opportunities include classes in anger management, thinking for change, living skills, parenting skills, substance abuse, GED, high school diploma, literacy, automobile mechanics, bakery occupations, culinary/reading enrichment classes, computer skills, HVAC training, fire camp vocational training, employment readiness, and re-entry services.

available to the general population. Plaintiffs also contend that certain aspects of this disparate treatment continue to this day.

The parties held several in-person settlement conferences before the Hon. Carla Woehrle (Ret.), as well as numerous discussions among or between counsel and Judge Woehrle. In addition, counsel for the parties met on several occasions to reach agreement on the Injunctive Relief terms. After extensive arms-length negotiations, the parties reached a settlement, which is contingent on this Court's approval. Declaration of Barrett S. Litt (hereafter "Litt Dec."), ¶ 15. The proposed settlement has now been agreed to by all parties. After a bidding process, the parties have agreed to a Class Administrator (JND Legal Administratoin).

II.   **TERMS OF THE SETTLEMENT**

The terms of the settlement are set forth in greater detail in the exhibits attached to the Proposed Preliminary Approval Order (specifically in the Settlement Agreement and the Injunctive Relief Terms), which exhibits are as follows:

Exhibit A          Settlement Agreement

Exhibit B          Proposed Class Notice

Exhibit C          Claim Form

Exhibit D          Injunctive Relief Terms

Exhibit E          JND Class Administration Bid and Credentials

In summary, the settlement's basic terms, as they relate to Damages Class Members, are that Defendants will provide payment of a total of $950,000. From that amount, the following awards will be made by the Class Administrator, subject to court approval:

a.   Incentive awards to the 15 Named Plaintiffs, if and to the extent approved by the Court, in the amount of $60,500.00.[2]

---

[2] Although Dan McKibben was a Named Plaintiff, he is deceased, and is being treated purely as a class member and not as a Named Plaintiff or Class Representative.

2

b. Payment of the third-party class settlement administration costs (estimated at a maximum of approximately $40,000 and possibly less depending on a variety of factors).

c. Certain litigation costs, specifically the consultant/expert and mediation fees advanced by Plaintiffs' counsel, estimated at approximately $37,000. (Other litigation costs will be absorbed by counsel and included in the Attorney's Fees and Costs Award.)

d. The remainder of the Class Fund (estimated at approximately $812,500 or more) shall be distributed to the class members (including Named Plaintiffs/Class Representatives) under a formula contained in Paragraphs 5-9 of the Settlement Agreement (Exhibit A to the proposed Preliminary Approval Order).

The formula is based on awarding a certain number of points for each day a Damages Class Member spent in the ALT. Because conditions varied over time, and the severity of what Damages Class Members experienced varied by both time and virtue of what opportunities they would have received when compared to comparably classified general population inmates, points vary by which category an inmate fit into in any given day. Only one set of points apply to a given day. (See the Settlement Agreement for an itemization of the categories.) The formula for distribution has been developed by Plaintiffs' Counsel and, if approved by the court, will be that summarized in the Class Notice to be sent to class members. The formula is designed to account for the fact that the severity of challenged conditions varied: (1) over time (with the most discriminatory and restrictive conditions occurring before October 2014); and, (2) depended, in part, on inmates' sentencing status, security classification, and work eligibility (with sentenced, work-eligible inmates experiencing the most discriminatory conditions).

To briefly summarize these variations in conditions, inmates incarcerated before October 2014 endured substantially less out-of-cell time than similarly

3

situated inmates housed outside of the ALT. (Whereas non-ALT inmates received out-of-cell time based on their security classification level, ALT-housed inmates were generally segregated even from each other, resulting in 23-hour lockdown on many days). Inmates designated as low security risk were most adversely affected by SBCSD's policies because they would have received the most out-of-cell time had they been housed outside of the ALT; inmates designated as higher security risk would have received less out-of-cell time and were therefore less adversely impacted. Accordingly, for the pre-10/14/14 time period, security classification is relevant to determining conditions of confinement and damages.

Throughout the class period, program access varied depending on sentencing status and work eligibility. All inmates, regardless of sentencing status, security classification or incarceration dates, were denied access to certain substance abuse rehab programs (AA/NA), "In-Roads" programs (only available at another SBCSD jail facility, the Glen Helen Rehabilitation Center), religious services, and volunteer work programs available to similarly-situated, general population inmates housed outside of the ALT. In addition, *sentenced* inmates (a minority of the class) were deprived of access to GED, high school diploma courses, and other educational programs available to similarly-situated, sentenced inmates housed outside of the ALT. Depending on their security classification, disciplinary history, and other factors, some sentenced inmates would also have been eligible for both vocational training courses and job assignments, had they not been housed in the ALT. A small minority of ALT-housed, work-eligible inmates received inferior job assignments but were denied access to vocational training.

Once daily points are assigned to all Damages Class Members, the points will be totaled, and a total point value will be calculated for the class as a whole and for each individual class member. Each class member's recovery will then be determinable based on that class member's percentage of the total points. It is likely that not all class members will make Timely Claims. Accordingly, a

claiming class member's percentage of the available funds will be determined based on that class member's total points in relation to the total points for those who made timely claims. (The Settlement Agreement provides how to determine what claims are timely.)

Despite the foregoing, no class member who qualifies for payment will receive less than a total of $40 or more than a total of $10,000. The purpose of the Maximum provision is to ensure that outliers who have outsized claims do not distort the meaningfulness of the recovery to the remaining class members,  and the purpose of the $40 minimum (which applies to those in the ALT even if only for a day or two). (The maximum outliers would be entitled to opt out and pursue their own claims if they so chose.) None of the $950,000 Damages Class Fund shall revert to the County. Any funds claimed but not cashed by a Class Member within one year of payment shall be paid to an agreed-upon *cy pres* organization.

In addition, the parties have agreed to the entry of an injunction, whose terms are set forth in Exhibit D to the Proposed Preliminary Approval Order.

Finally, the Defendants shall pay Attorney's Fees and Costs in the amount of $1,100,000 as compensation for statutory fees and certain costs pursuant to 42 U.S.C. § 1988.  (The costs included in this award includes all litigation costs incurred except for mediation costs, consultant/expert costs and Class Administration costs.) This fee shall be the subject of a separate Motion for Attorney's Fees to be heard at the Final Approval Hearing, to be analyzed under the standards for an award of fees and costs to a prevailing plaintiff under 42 U.S.C. § 1988 and Civil Code § 52.1(h). The Class Notice will advise class members of this motion and their right to object to it (as well as to other terms of the settlement).

The parties agree that these fees were independently negotiated with the assistance of Judge Woehrle and that, in order to effectuate this settlement, the fees were substantially discounted below the amounts that Plaintiffs would have sought

as reasonable fees in an attorney's fee motion filed by Plaintiffs as the prevailing parties on the merits in the absence of a settlement. Litt Dec. ¶ 16; Settlement Agreement ¶ 13.

Because the parties were in ongoing settlement discussions, no class certification was previously filed. One is being filed contemporaneously with this motion and will define the classes as follows:

**Damages Class (Rule 23(b)(3)):** individuals who, between October 22, 2012, and March 31, 2018, were GBT inmates housed in the Alternative Lifestyles Tank (hereafter "ALT") of the San Bernardino County jail facility known as West Valley Detention Center ("WVDC").

**Injunctive Relief Class (Rule 23(b)(2)):** individuals who currently are, or in the future will be, GBT inmates housed in the San Bernardino County jails, including but not limited to those housed in the ALT.

The settlement provides for the Class Administrator to mail notice to all class members, as well as to publish notice, and provides class members the opportunity to object or opt out. The full details of the agreement and the proposed schedule are contained in the proposed Preliminary Approval Order and exhibits thereto, which is filed contemporaneously with this motion.

A separate stipulation is submitted concurrent with this motion stating that 1) the motion is unopposed and is in fact concurred in by the Defendants, 2) the parties stipulate to the entry of the Preliminary Approval Order, and 3) the parties stipulate to shortening time on this motion and the class certification motion so that it can be heard within two weeks of filing in order to expedite the approval and class notice process since there is no opposition and there are no additional filings.

The dates proposed in the accompanying proposed Preliminary Approval Order assume entry of the order no later than September 17, 2018. If an order is not entered by that time, the dates will have to be extended. The draft preliminary

approval order indicates the time needed between the various events if the ties do need to change.

## III.   THE STANDARDS FOR ENTRY OF THE PRELIMINARY APPROVAL ORDER HAVE BEEN MET

The following from the court in *Cotter v. Lyft, Inc.*, 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016) well explains the preliminary approval inquiry as follows:

"District courts have interpreted Rule 23(e) to require a two-step process for the approval of class action settlements: 'the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted.' " *In re High–Tech Emp. Antitrust Litig.*, No. 11–CV–02509–LHK, 2014 WL 3917126, at *3 (N.D.Cal. Aug. 8, 2014) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D.Cal.2004)). At the final approval stage, it is well-established that the Court must balance the following non-exhaustive factors to evaluate the fairness of the proposed settlement: "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Hanlon*, 150 F.3d at 1026 (citing *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir.1993)).

It is less clear what factors should guide the Court's evaluation of the proposed settlement at the preliminary approval stage. "Some district courts ... have stated that the relevant inquiry is whether the settlement 'falls within the range of possible approval' or 'within the range of reasonableness.' " *In re High–Tech Emp. Antitrust Litig.*, 2014 WL

3917126, at *3 (quoting *In re Tableware Antitrust Litig.,* 484 F.Supp.2d 1078, 1079 (N.D. Cal. 2007)) (citing *Cordy v. USS– Posco Indus.,* No. 12–553, 2013 WL 4028627, at *3 (N.D. Cal. Aug. 1, 2013)). In determining whether the proposed settlement falls within the range of reasonableness, perhaps the most important factor to consider is "plaintiffs' expected recovery balanced against the value of the settlement offer." *Id.* (quoting *In re Nat'l Football League Players' Concussion Injury Litig.,* 961 F.Supp.2d 708, 714 (E.D. Pa. 2014)); *see also Nielson v. Sports Auth.,* No. C–11–4724–SBA, 2012 WL 5941614, at *6 (N.D. Cal. Nov. 27, 2012). Determining whether the settlement falls in the range of reasonableness also requires evaluating the relative strengths and weaknesses of the plaintiffs' case; it may be reasonable to settle a weak claim for relatively little, while it is not reasonable to settle a strong claim for the same amount. *See In re High–Tech Emp. Antitrust Litig.,* 2014 WL 3917126, at *4.

The standards for entry of a preliminary approval order have been similarly summarized in *Newberg on Class Actions* as follows:

> [T]he goal of preliminary approval is for a court to determine whether notice of the proposed settlement should be sent to the class, not to make a final determination of the settlement's fairness. Accordingly, the standard that governs the preliminary approval inquiry is less demanding than the standard that applies at the final approval phase. Some courts go so far as to state that a proposed settlement is 'presumptively reasonable at the preliminary approval stage, and there is an accordingly heavy burden of demonstrating otherwise.' Nevertheless, most courts will not simply "rubber-stamp" a motion for preliminary approval, and review is more than "perfunctory."

> "Bearing in mind that the primary goal at the preliminary review stage is to ascertain whether notice of the proposed settlement should be sent to

the class, courts sometimes define the preliminary approval standard as determining whether there is '"probable cause" to submit the [settlement] to class members and [to] hold a full-scale hearing as to its fairness.' More specifically, courts will grant preliminary approval where the proposed settlement 'is neither illegal nor collusive and is within the range of possible approval.' Courts in most circuits use some variation of this test. The test grew out of a statement in an early version of the *Manual for Complex Litigation* calling for approval if 'the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible [judicial] approval.' Many courts continue to utilize that phrasing of the test.

     …

     "The general test—holding that a settlement will be preliminarily approved if it 'is neither illegal nor collusive and is within the range of possible approval'—contains both procedural and substantive elements. The procedural element focuses on the nature of the settlement negotiations and the possibility of collusion, while the substantive element focuses on the terms of the agreement itself. …".

*Newberg on Class Actions* §13:13 (5th ed.) (footnote references and footnotes omitted).

     While there is heightened Court scrutiny in granting preliminary settlement approval where a settlement class is stipulated to and class certification was not independently litigated (*see, e.g., Staton v. Boeing Co.,* 327 F.3d 938, 952 (9th Cir. 2003)), the proposed settlement well meets any heightened inquiry given the showing made in the class certification, the arm's length and extensive mediation

process, the favorable settlement terms to the injunctive relief and damages classes, and the heavily discounted attorney's fees.

Applying the factors for preliminary approval, this case qualifies for such approval. The following facts are uncontested or stipulated to in the parties' accompanying stipulation for purposes of the settlement and pleadings related to it:

1. Each Named Plaintiff's allegations in the Complaint are deemed to have been sworn to under penalty of perjury for purposes of the class certification motion and thus constitute evidence supporting Plaintiffs' claims.

2. The settlement terms were negotiated at arms' length with the assistance of an experienced mediator and jurist, retired United States Magistrate Judge Carla Woehrle. The final settlement figure was the product of a mediator's proposal and her interactions with both sides to reach agreement. Litt Dec., ¶ 15.

3. Plaintiffs conducted extensive documents discovery, and carefully reviewed and analyzed the documents. While depositions were not conducted, there were several meetings with Defendants' counsel and SBCSD command staff to address issues regarding jail operations, the issues they perceived as challenges and potential solutions. The SBCSD provided both formal and informal discovery concerning the general jail operations and conditions for general population inmates and the ALT. Further, Plaintiffs' counsel conducted inspections of the WVDC where GBT and non-GBT inmates are housed, and the Glen Helen Rehabilitation Center, to determine conditions of confinement for GBT and non-GBT inmates, with their expert consultant. While there were factual disagreements on certain specifics, there was not disagreement on the basic fact that, for a long time, time out of cell had been disparate between ALT inmates and similarly situated

10

general population inmates, and that ALT inmates had significantly less programming and work opportunities than did similarly situated general population inmates. Litt Dec., ¶ 12.

4. There were arms' length negotiations and no collusion, as evidenced by the extensive discovery and mediation process. (See Litt Dec. ¶ ¶ 15, 17 for the first four of these factors.)

5. The proposed settlement provides a slight benefit to the class representatives (ranging from $2000 to $5500 in addition to their class member formula award, depending on the role and contribution of the class representative). The proposal for incentive awards was at Class Counsel's initiative, and no discussion or agreement regarding incentive awards occurred with the Named Plaintiffs until the proposed settlement was reached, and the proposed incentive awards to each Named Plaintiff reflects counsel's assessment (after discussion with each of the class representatives) of the contribution of various individual Class Representatives. Litt Dec., ¶ 18.

6.  While there is a larger than normal number of class representatives, that is due to Class Counsel's judgment that there were several categories of class representatives needed in order to have both those in custody with standing to seek injunctive relief, and those not in custody in order to have damages class representatives who were not in custody and therefore not subject to PLRA restrictions. It was also Class Counsel's judgment that they needed a larger than usual number of class representatives due to the variety of deprivations at which the Complaint was aimed (e.g., drug treatment, mental health treatment, education, work opportunities), for each of which it was important to have a class representative who personally experienced that deprivation. *Id.* These figures are well within the range of acceptable

11

incentive payments to class representatives for which the Court has discretion in recognition of work done on behalf of the class and in consideration of the risk undertaken in bringing the action. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009); *Staton,* 327 F.3d at 977 (recognizing that service awards to named plaintiffs in a class action are permissible and do not render a settlement unfair or unreasonable); *Glass v. UBS Fin. Servs., Inc.,* 2007 WL 221862, at *16 (N.D. Cal. Jan.26, 2007) (approving payments of $25,000 to each named plaintiff); *Van Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 299 (N.D. Cal.1995) (awarding $50,000 to a lead plaintiff). "An incentive award of $5,000 per class representative is in line with other awards approved in this circuit." *Weeks v. Kellogg Co.*, No. CV 09-08102 MMM RZX, 2013 WL 6531177, at *37 (C.D. Cal. Nov. 23, 2013). Plaintiffs will more fully brief this issue in connection with the final approval order and address it here only to demonstrate that this is appropriate. The Class Notice will advise class members of this proposed incentive award, thereby allowing them the opportunity to object to it.

7. The class size has been determined to be approximately 1000 bookings and 500 class members through June 2017 and is now somewhat larger.  Defendants will update the bookings through March 31, 2018.  (Litt Dec. ¶ 14,) The accepted bid for class administration costs are expected to be a maximum of $40,000 and possibly less depending on a variety of factors. When added to the $60,500 in incentive awards and the approximately $37,000 for expert/consulting and mediation costs suggests that approximately $812,500 will be left to the class formula distribution, an average (mean) payout of over $1200 (which will of course vary depending on the length and

timing of custody and other factors) would occur even if every class member filed a claim, which experience shows does not happen. In Plaintiffs' counsel's extensive experience in jail cases, a claims rate of 20% is generally considered good. (See Litt Declaration, ¶ 19.) Because of the small class size, and the potential that class members are more in contact with each other than in typical jail cases, a 50% claims rate is being estimated. If that turns out to be so, then the mean recovery would exceed $2400.

8. The agreed-upon attorneys' fee award, subject to court approval, of $1,100,000 reflects a substantial discount from what Plaintiffs' counsel would have sought and would reasonably expect to be awarded as statutory attorney's fees. Litt Dec., ¶ 16. While the fees are slightly higher than the Class Damages Fund, the focus of the case was injunctive relief, on which a large amount of time was spent, and this is not a percentage of the fund case because Plaintiffs' counsel are entitled to statutory attorneys' fees, which (unlike percentage of the fund class awards) are not correlated to the size of the plaintiffs' recovery, and look to the reasonable hours and rates and the public benefit that resulted from the litigation. *See City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 2695, 91 L.Ed.2d 466 (1986), (quoting S.Rep. No. 94-1011, p. 6 (176), reprinted in, U.S. Code Cong. & Admin.News 1976 pp. 5908, 5913 ("[b]ecause damage awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases ... to depend on obtaining substantial monetary relief. Rather, Congress made clear that it 'intended that the amount of fees ... not be reduced because the rights involved may be nonpecuniary in nature.' ") (emphasis added by Supreme Court)). As a result, "[e]ven in cases

13

seeking only monetary relief, 'a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damage awards.' *Id*. [*Rivera*] at 2694. Therefore, it is inappropriate for a district court to reduce a fee award below the lodestar simply because the damages obtained are small. Permitting such reductions would create an incentive to bring only those civil-rights cases that would produce large damage awards. This incentive conflicts with the purposes of section 1988. *See id.* [*Rivera*] at 2695-97." *Quesada v. Thomason*, 850 F.2d 537, 540 (9th Cir. 1988)

9. The injunctive relief terms, which as indicated represented the heart of the relief Plaintiffs sought, are very favorable to the Plaintiffs and in many respects break new ground and are a model for how jails address these issues. The parties' agreement establishes a PREA-GBTI committee whose purpose is to discuss the housing assignment, programming options, educational options, and employment options for inmates who self-identify as GBTI, including to meet with the inmate to ensure they understand their options and to determine the most appropriate housing (based on a variety of considerations, including gender identity), programming and employment options for that inmate, which could include general population housing, housing in the ALT, and for transgender inmates who identify as female, housing in female detainee units. The agreement is groundbreaking in its specificity regarding policies needed to address the needs of transgender inmates, including the aforementioned housing assignment, choice as to the gender of deputies performing searches, and access to hormonal medication to treat gender dysphoria while in jail.  The agreement addresses in detail the approach to housing and classification, work and employment, programming and time out of

14

cell issues. It ensures equal time-out-of-cell for GBT inmates as compared to non-GBT inmates, and equal programing and work opportunities.  It also provides for staff training and zero tolerance standards for staff harassment or discrimination, special considerations for transgender inmates, PREA [Prison Rape Elimination Act] compliance and advancement, and monitoring of the Agreement. See Exhibit D to the proposed Preliminary Approval Order; Litt Dec. ¶ 16.

Examining what the *Cotter* Court looked to as the most important factor to consider ("plaintiffs' expected recovery balanced against the value of the settlement offer"), the proposed settlement is reasonable. Plaintiffs consider their case to be strong, especially since California expressly applies strict scrutiny to claims of sexual orientation discrimination. *See, e.g., In re Marriage Cases*, 43 Cal. 4th 757, 839-44, 183 P.3d 384, 440-44 (2008) (classifications based on sexual orientation are a suspect classification for purposes of state constitution and are subject to strict scrutiny).[3] Defendants believed they had a substantial defense based on their contentions, which Plaintiffs disputed, that ALT inmates had made a voluntary and informed choice to be placed in the ALT, and that ALT inmates were comparable not to the general population but to protective custody inmates, who had similar restrictions to those experienced by Plaintiffs.

The monetary recovery for the Class is good, but Plaintiffs' counsel do not consider it exceptional for a class of this size. Assuming an average recovery of

---

[3] Likewise, California courts apply strict scrutiny to claims of gender based discrimination.  *Woods v. Horton*, 167 Cal. App. 4th 658, 674 (2008); *Hardy v. Stumpf*, 21 Cal. 3d 1, 7 (2008); *Molar v. Gates*, 98 Cal. App. 3d 1, 16 (Cal. Ct. App.1979) ("gender-based classifications . . . must be strictly scrutinized irrespective of the nature of the interest implicated because the classifications in and of themselves are an affront to the dignity and self-respect of the members of the class set apart for disparate treatment.").  And discrimination based on gender identity (e.g. one's identity as a

1 approximately $2400 for claiming class members, this is 60% of the minimum

2 statutory damages available under California Civil Code § 52.1. While, if Plaintiffs

3 were to prevail, class members would be entitled to damages, it is difficult to

4 assess a likely recovery. Comparing this recovery to other class actions for

5 damages in the jail context involving over-detentions and strip searches, a recovery

6 of $2400 per class members compares favorably. *See* Litt Declaration, ¶¶ 19-20.

7      Plaintiffs do, however, believe that the injunctive relief resolution provides a

8 model in many respects. In essence, Plaintiffs' counsel agreed, in the interests of

9 the class, to a significantly reduced fee in exchange for what they consider a model

10 of injunctive relief in addressing gay, bisexual, and transgender (and intersex)

11 issues in correctional facilities, balancing the desires of GBT inmates to have a unit

12 of their own where they felt safe, but providing them the opportunity to be housed

13 in general population, and also providing them equal treatment while residing in

14 the ALT and enhanced protection if they choose general population housing.

15      A factor driving settlement from Plaintiffs' perspective is that, even given

16 the strength of Plaintiffs' claim, this case could have spread out over several years,

17 especially if there was an appeal. In light of all the factors, Plaintiffs' counsel

18 believe the settlement is a fair and reasonable one.  This assessment was concurred

19 in and in fact strongly urged by the independent mediator.

20      Given all of these factors, it was the judgment of Plaintiffs' counsel that the

21 settlement represents a fair compromise reflecting "plaintiffs' expected recovery

22 balanced against the value of the settlement offer." Accordingly, the proposed

23 settlement is certainly "within the range of possible approval." (*Newberg*, *supra*.)

24 **IV.   CONCLUSION**

25      For the foregoing reasons, Plaintiffs ask that the Court preliminarily approve

26 the settlement, and sign the proposed Preliminary Approval Order (with any

27

28 transgender person) is, by definition, discrimination on the basis of gender.  *See, e.g.*,
Gov. Code §12926(r)(C)(2); Cal. Penal Code §11410(b)(3); Cal Gov. Code §11135(e).

revisions the Court deems necessary). That Order contains dates that have been worked out among the parties and reviewed by the Class Administrator. They assume that the order will be entered by September 17, 2018. If it is later, the dates may need to be modified to allow sufficient time to follow the schedule.

DATED: August 13, 2018          Respectfully submitted,

                                KAYE, McLANE, BEDNARSKI & LITT,   LLP
                                ACLU FOUNDATION OF SOUTHERN
                                CALIFORNIA

                                By: /s/ Barrett S. Litt
                                    Barrett S. Litt
                                    Attorneys for Plaintiffs

17