BARRETT S. LITT, SBN 45527
blitt@kmbllaw.com
DAVID S. McLANE, SBN 124952
dmclane@kmbllaw.com
LINDSAY BATTLES, SBN 262282
lbattles@kmbllaw.com
KAYE, MCLANE, BEDNARSKI & LITT
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7600
Facsimile: (626) 844-7670

MELISSA GOODMAN, SBN 289464
MGoodman@aclusocal.org
BRENDAN M. HAMME, SBN 285293
BHamme@aclusocal.org
PETER J. ELIASBERG, SBN 189110
PEliasberg@aclusocal.org
AMANDA C. GOAD, SBN 297131
AGoad@aclusocal.org
ADITI FRUITWALA, SBN 300362
AFruitwala@aclusocal.org
ACLU Foundation of Southern CA
1313 West 8th Street
Los Angeles, California 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5299

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAN MCKIBBEN, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>JOHN MCMAHON, et al.,<br><br>Defendants. | Case No.14-2171-JGB-SP<br><br>[Hon. Jesus G. Bernal]<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; [PROPOSED] ORDER; DECLARATIONS AND EXHIBITS**<br><br>**Date:       February 11, 2018**<br>**Time:       9:00 A.M._**<br>**Place:      Courtroom 1__** |

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on February 11, 2018, at 9:00 a.m., or as soon thereafter as this matter may be heard in Courtroom 1 of the above-entitled Court, located at 3470 Twelfth Street, Riverside, CA 92501-3801, Plaintiffs will, and hereby do, move the Court to finally approve the proposed settlement in this case, and to authorize the mailing and other forms of notice to class members.

This motion is based on the accompanying Memorandum of Law, the stipulation of all parties to settlement and prior entry of the Preliminary Approval Order, the Preliminary Approval Order and exhibits thereto, the declarations and other evidence presented in connection with this motion, the previously filed motion for attorney's fees, the files and records in this case, and on such further evidence as may be presented at a hearing on the motion.

DATED: January 17, 2018      Respectfully submitted,

Kaye, McLane, Bednarski & Litt, LLP
ACLU Foundation Of Southern California

By: /s/ Barrett S. Litt
     Barrett S. Litt
     Attorneys for Plaintiffs

i

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   SUMMARY OF THE TERMS OF THE SETTLEMENT .......................4

III.  THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND
      ADEQUATE. ........................................................................................8

      A.   The Amount Of The Settlement In Light Of The Potential Recovery
           Risks Of Prevailing And Maintaining Class Action Status. ...............8
      B.   The Extent Of The Discovery Conducted...........................................11
      C.   The Complexity And Potential Costs Of Trial ...................................12
      D.   The Number And Content Of Objections ............................................12
      E.   The Recommendations Of Experienced Counsel That Settlement Is
           Appropriate .........................................................................................13
      F.   Arm's Length Negotiations And The Absence Of Collusion..............14
      G.   The Capacity For The Defendant To Withstand A Larger Judgment 14

IV.   NONE OF THE RED FLAGS IDENTIFIED AS CAUTIONS TO
      PROPOSED SETTLEMENTS ARE PRESENT HERE. .......................14

V.    THE INJUNCTIVE RELIEF PROVISIONS ARE HIGHLY
      FAVORABLE TO THE CLASS. .........................................................16

VI.   THE LIMITED INCENTIVE AWARDS FOR THE NAMED
      PLAINTIFFS ARE APPROPRIATE. ..................................................17

VII.  LATE CLAIMS .................................................................................20

VIII. UPDATED ATTORNEY FEE INFORMATION ...................................20

IX.   SETTLEMENT TERMS NOT ADDRESSED IN THIS MOTION BUT
      CONTAINED IN THE FINAL ORDER OF APPROVAL. ....................21

X.    EFFECTIVE DATE OF THE SETTLEMENT.......................................21

XI.   CONCLUSION...................................................................................21

# TABLE OF AUTHORITIES

## Federal Cases

*Aguayo v. Oldenkamp Trucking*
   No. F04–6279 AWI LJO, 2006 WL 3020943 (E.D.Cal. Oct. 17,
   2006) ........................................................................................................ 20

*Chun–Hoon v. McKee Foods Corp*.
   716 F.Supp.2d 848 (N.D.Cal.2010)................................................... 13

*Clesceri v. Beach City Investigations & Protective Services, Inc.*
   2011 WL 320998 (C.D.Cal. Jan. 27, 2011)........................................ 19

*Dennis v. Kellogg Co.*
   No. 09–CV–1786–IEG, 2010 WL 4285011 (S.D.Cal. Oct. 14,
   2010)........................................................................................................ 20

*Devlin v. Scardelletti*
   536 U.S. 1, 122 S. Ct. 2005 (2002) ................................................... 21

*Faigman v. AT & T Mobility LLC*
   No. C06–04622 MHP, 2011 WL 672648 (N.D.Cal. Feb. 16, 2011) ............... 19

*Glass v. UBS Fin. Servs., Inc.*
   2007 WL 221862 (N.D.Cal. Jan.26, 2007) ...................................... 20

*Hanlon v. Chrysler Corp*.
   150 F.3d 1011 (9th Cir. 1998).............................................................. 8

*Hartless v. Clorox Co.*
   273 F.R.D. 630 (S.D.Cal.2011) ......................................................... 19

*Lane v. Facebook, Inc*.
   696 F.3d 811 (9th Cir. 2012)............................................................... 11

*In re Mego Financial Corp.*
   213 F.3d at 463 ................................................................................... 19

*In re Online DVD-Rental Antitrust Litig*.
   779 F.3d 934 (9th Cir. 2015).............................................................. 19

*Rodriguez v. West Publishing*
   563 F.3d 948(9th Cir. 2009).......................................................... 13, 18

iii

*In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions*
  *Act (FACTA) Litig.*
    295 F.R.D. 438 (C.D. Cal. 2014) ........................................................ 12

*Van Vranken v. Atl. Richfield Co.*
    901 F.Supp. 294 (N.D.Cal.1995) ................................................. 19, 20

*Weeks v. Kellogg Co.*
    No. CV 09-08102 MMM RZX, 2013 WL 6531177 (C.D. Cal. Nov.
    23, 2013) .......................................................................................... 19

**State Cases**

*Hardy v. Stumpf*
    21 Cal. 3d 1 (2008) ............................................................................ 9

*In re Marriage Cases*
    43 Cal. 4th 757, 183 P.3d 384 (2008) ................................................ 9

*Molar v. Gates*
    98 Cal. App. 3d 1 (Cal. Ct. App.1979) .............................................. 9

*Woods v. Horton*
    167 Cal. App. 4th 658 (2008) ............................................................. 9

**Federal Statutes**

42 U.S.C. §1988 ...................................................................................... 7

Prison Rape Elimination Act ................................................................ 11

**State Statutes**

Cal Gov. Code §11135(e) ..................................................................... 10

Cal. Penal Code §11410(b)(3) .............................................................. 10

Civil Code §52.1 ................................................................................... 10

Civil Code §52.1(h) ................................................................................ 7

Gov. Code §12926(r)(C)(2) .................................................................. 10

# Rules

F.R.Civ.P 23 (c)(2)(B) ................................................................................................ 3

Rule 23(b)(2) ........................................................................................................ 2

Rule 23(b)(3) ........................................................................................................ 2

Rule 23(e) ............................................................................................................ 8

# Other Authorities

*Manual for Complex Litigation*, Fourth, §21.61 ................................................... 14

*Newberg on Class Actions* §13:48 (5th ed.) ............................................... 8

*Newberg on Class Actions*, §13.48 ........................................................ 11

*Newberg on Class Actions* §14:13 (5th ed.) ................................................ 21

*Newberg, §13:53.Criteria* ................................................................. 14

*Newberg §13:56* ......................................................................... 14

*Newberg*, §13:56-13:61 ............................................................. 14, 18

## MEMORANDUM OF POINTS & AUTHORITIES

## I.   INTRODUCTION

Plaintiffs are former or current (at the time of the filing of the complaint) inmates of jails operated by the San Bernardino County Sheriff's Department (hereafter "SBCSD"). SBCSD maintained and maintains an "Alternative Lifestyle Tank" (hereafter "ALT") at the West Valley Detention Center (hereafter "WVDC"), which houses inmates who self-identify as gay, bisexual, and/or transgender (hereinafter "GBT inmates"). The WVDC is the only SBCSD jail facility that houses self-identified GBT inmates who were assigned male at birth.

Plaintiffs, and the classes they represent, contend that Defendants have engaged in systematic discrimination and denial of equal treatment against GBT inmates at the WVDC. Plaintiffs contend, inter alia, that GBT inmates 1) were automatically placed in the ALT if they self-identified as GBT; 2) would have been at risk for their safety if admitted to the general population as openly GBT inmates because SBCSD did not have any means or programs to ensure their safety; 3) had no or inadequate PREA programs in place to protect GBT inmates or address particular vulnerabilities of GBT inmates placed in the general population; 4) were limited in their time-out-of-cell generally to an hour and a half per day, and often less, in contrast to similarly situated (by classification or sentencing status) general population inmates; 5) were denied the same work opportunities that were provided to similarly situated (by classification or sentencing status) general population inmates; 6) were denied the same programming opportunities[1] that were provided to similarly situated (by classification or sentencing status) general population inmates; and 7) a comparable range of religious services to those

---

[1] Programming opportunities include classes in anger management, thinking for change, living skills, parenting skills, substance abuse, GED, high school diploma, literacy, automobile mechanics, bakery occupations, culinary/reading enrichment classes, computer skills, HVAC training, fire camp vocational training, employment readiness, and re-entry services.

available to the general population. Plaintiffs also contend that certain aspects of this disparate treatment continue to this day.

The parties held several in-person settlement conferences before the Hon. Carla Woehrle (Ret.), as well as numerous discussions among or between counsel and Judge Woehrle. In addition, counsel for the parties met on several occasions to reach agreement on the Injunctive Relief terms. From early in the case, the parties entered into settlement negotiations with the assistance of Hon. Carla Woehrle (Ret.), as well as numerous discussions among or between counsel for each side and Judge Woehrle. Numerous mediation sessions were held, both with Magistrate Judge Woehrle and directly between the parties. Agreements were reached in phases – first injunctive relief, then the damages class fund and finally attorney's fees (which were the subject of a mediator's proposal). Judge Woehrle was involved at each stage. Declaration of Barrett S. Litt (hereafter "Litt Dec."), ¶ 3.

Because the parties were in ongoing settlement discussions, the class certification motion was filed simultaneously with the preliminary approval motion. The Court certified the following classes (Doc. 84):

**Damages Class (Rule 23(b)(3)):** individuals who, between October 22, 2012, and March 31, 2018, were GBT inmates housed in the Alternative Lifestyles Tank (hereafter "ALT") of the San Bernardino County jail facility known as West Valley Detention Center ("WVDC").

**Injunctive Relief Class (Rule 23(b)(2)):** individuals who currently are, or in the future will be, GBT inmates housed in the San Bernardino County jails, including but not limited to those housed in the ALT.

The settlement provided for the Class Administrator to mail notice to all class members, as well as to publish notice, and provided class members the opportunity to object or opt out. Notice was sent out on September 14, 2018, in compliance with the schedule ordered in the Preliminary Approval Order. Declaration of Jennifer M. Keogh from JND Legal Administration (hereafter

"Keogh Dec.") ¶7. Additionally, email notice was sent to each of the 1,209 valid e-mail addresses on the Settlement Class Member List, as authorized by the recent revisions to F.R.Civ.P 23 (c)(2)(B) effective December 2018 (acknowledging that notice "may be by ... electronic means, or other appropriate means" in addition to or in lieu of United States mail). *Id.* ¶9. Address searches were done for returned mail, and 37 new claim forms were sent to located addresses (combined total of $31,404.97 for fees and costs to date and future fees and costs of $8,595.03). *Id* ¶8. In lieu of notice by publication, JND conducted an internet advertising campaign to inform class members of the settlement. *Id.* ¶15. A total of 158 approved claim forms were filed on or before January 7, 2018. *Id.* ¶22. There were no opt outs and no objections. *Id.*. ¶¶17-18.

The final class size was determined to be 660 unique class members through March 31, 2018, the damages cutoff date. *Id*. ¶4. The Class Notice advised class members that the class administration costs were capped at $40,000 (which was reached). When the $40,000 in class administration costs is added to the $60,500 in incentive awards and the $36,304.49 for expert/consulting and mediation costs to be taken from the class fund, $813,195.51 remains for distribution among class members.

As of January 16, 2019: there are 165 approved Claim Forms from individuals identified as Settlement Class Members who filed claims within the January 7, 2019, deadline; four (4) claim forms have been denied as duplicative; 382 Claims Forms were submitted by individuals who do not appear on the Class List; two Claim Forms were missing signatures or other required information for which deficiency notices will be sent to them; and two claim forms were received with postmarks dated after January 7, 2019 (late claims). *Id.*. ¶21.

The terms of the settlement are set forth in detail in the Settlement Agreement attached as Exhibit A to Plaintiffs' Motion for Preliminary Approval Order and (reattached as Exhibit A to the proposed Final Order of Approval).

II.     **SUMMARY OF THE TERMS OF THE SETTLEMENT**

The terms of the settlement are set forth in greater detail in the exhibits attached to the Proposed Preliminary Approval Order (specifically in the Settlement Agreement and the Injunctive Relief Terms). Exhibit A to that proposed order is the settlement agreement, which is again attached as Exhibit A to the proposed Final Order of Approval. Exhibit D to that proposed order is the injunctive relief agreement, which is again attached, this time as Exhibit B, to the proposed Final Order of Approval.

In summary, the settlement's basic terms, as they relate to Damages Class Members, are that Defendants will provide payment of a total of $950,000. From that amount, the following awards will be made by the Class Administrator, subject to court approval:

a.  Incentive awards to the 15 Named Plaintiffs, if and to the extent approved by the Court, in the amount of $60,500.00.[2]

b.  Payment of the third-party class settlement administration costs (the final amount of which is $40,000).

c.  Certain litigation costs, specifically the consultant/expert and mediation fees advanced by Plaintiffs' counsel, amounting to $36,304.49. (Other litigation costs will be absorbed by counsel and included in the Attorneys' Fees and Costs Award.)

d.  The remainder of the Class Fund ($813,195.51) shall be distributed to the class members (including Named Plaintiffs/Class Representatives) under a formula contained in Paragraphs 5-9 of the Settlement Agreement (Exhibit A to the proposed Preliminary Approval Order).

The formula is based on awarding a certain number of points for each day a Damages Class Member spent in the ALT. Because conditions varied over time,

---

[2] Although Dan McKibben was a Named Plaintiff, he is deceased, and is being treated purely as a class member and not as a Named Plaintiff or Class Representative.

and the severity of what Damages Class Members experienced varied by both time and virtue of what opportunities they would have received when compared to comparably classified general population inmates, points vary by which category an inmate fit into in any given day. Only one set of points apply to a given day. (See the Settlement Agreement for an itemization of the categories.)

The formula for distribution is set forth in detail in ¶8 of the Settlement Agreement, which formula is approved by the Court. In summary, there are several categories of inmates based on the time of incarceration, whether the inmate was sentenced or pre-sentenced, the inmate's security classification, and at certain periods whether the inmate had a job assignment or not and whether it was a good job assignment or not. There are also distinctions based on the time of incarceration, factoring in the severity of conditions before and starting with October 1, 2014. Daily point values were assigned to each category. The points of claiming inmates are tallied, and then a percentage of the Class Fund available for distribution is calculated for each claiming inmate.

To briefly summarize these variations in conditions, inmates incarcerated before October 2014 endured substantially less out-of-cell time than similarly situated inmates housed outside of the ALT. (Whereas non-ALT inmates received out-of-cell time based on their security classification level, ALT-housed inmates were generally segregated even from each other, resulting in 23-hour lockdown on many days). Inmates designated as low security risk were most adversely affected by SBCSD's policies because they would have received the most out-of-cell time had they been housed outside of the ALT; inmates designated as higher security risk would have received less out-of-cell time and were therefore less adversely impacted. Accordingly, for the pre-10/14/14 time period, security classification is relevant to determining conditions of confinement and damages.

Throughout the class period, program access varied depending on sentencing status and work eligibility. All inmates, regardless of sentencing status, security

classification or incarceration dates, were denied access to certain substance abuse rehab programs (AA/NA), "In-Roads" programs (only available at another SBCSD jail facility, the Glen Helen Rehabilitation Center), religious services, and volunteer work programs available to similarly-situated, general population inmates housed outside of the ALT. In addition, *sentenced* inmates (a minority of the class) were deprived of access to GED, high school diploma courses, and other educational programs available to similarly-situated, sentenced inmates housed outside of the ALT. Depending on their security classification, disciplinary history, and other factors, some sentenced inmates would also have been eligible for both vocational training courses and job assignments, had they not been housed in the ALT. A small minority of ALT-housed, work-eligible inmates received inferior job assignments but were denied access to vocational training.

Despite the provisions for point calculations for each claiming class member, no class member who qualifies for payment will receive less than a total of $40 or more than a total of $10,000. The purpose of the Maximum provision is to ensure that outliers who have outsized claims do not distort the meaningfulness of the recovery to the remaining class members, and the purpose of the $40 minimum (which applies to those in the ALT even if only for a day or two) is to provide some measure of meaningful compensation if a claim is filed. (The maximum outliers were entitled to opt out and pursue their own claims if they so chose, but none did.) None of the $950,000 Damages Class Fund reverts to the County. Any funds claimed but not cashed by a Class Member within one year of payment shall be paid to an agreed-upon *cy pres* organization.

In addition, the parties have agreed to the entry of an injunction, whose terms are set forth in Exhibit D to the Proposed Preliminary Approval Order and attached to the proposed Final Approval Order as Exhibit B. The settlement and injunctive relief agreement provide that policies will be agreed to between the parties, with the court retaining jurisdiction to resolve differences if they cannot be

agreed to. Settlement Agreement, ¶15; Injunctive Relief Agreement §9.1. The parties have agreed that Defendants will begin implementing the Order as soon as the Order of Approval is entered. Regarding the policies to be developed, the parties have also agreed San Bernardino will provide draft policies within 60 days of the effective date of the settlement (which is the date the order is entered since there are no objections, at least to date, and thus no potential appeal). After receipt of the proposed policies, plaintiffs will respond in writing within 45 days. The parties will then meet on one or more occasions in an effort to resolve any differences of opinion. If there remain unresolved issues after six months from the effective date of the settlement, they shall be brought to the court's attention by a joint status report setting out the issues and each side's position (along with any relevant documents). The status report shall request a hearing date for the court to resolve the outstanding issues. These provisions are contained in the proposed Final Approval Order.

Finally, the Defendants shall pay Attorneys' Fees and Costs in the amount of $1,100,000 as compensation for statutory fees and certain costs pursuant to 42 U.S.C. §1988. (The costs included in this award includes all litigation costs incurred except for mediation costs, consultant/expert costs and Class Administration costs.) This fee is the subject of a separate Motion for Attorneys' Fees to be heard at the Final Approval Hearing, to be analyzed under the standards for an award of fees and costs to a prevailing plaintiff under 42 U.S.C. §1988 and Civil Code §52.1(h). The Class Notice advised class members of this motion and their right to object to it (as well as to other terms of the settlement). That fee motion was timely filed. Doc 68.

The parties agree that these fees were independently negotiated with the assistance of Judge Woehrle and that, in order to effectuate this settlement, the fees were substantially discounted below the amounts that Plaintiffs would have sought as reasonable fees in an attorneys' fee motion filed by Plaintiffs as the prevailing

parties on the merits in the absence of a settlement. Litt Preliminary Approval Dec. ¶16; Settlement Agreement ¶13.

## III.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE.

Rule 23(e) mandates that a court may approve a proposed class action settlement only if it is "fair, reasonable, and adequate." The factors articulated throughout the Circuit courts in determining if the settlement is fair, reasonable, and adequate, and for thereby entering a final approval order, have been summarized in *Newberg on Class Actions* §13:48 (5th ed.). Combining those factors with the ones identified in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) the following factors appear to be the key ones to assess the fairness, reasonableness and adequacy of the proposed settlement: 1) the amount of the settlement in light of the potential recovery discounted by the risks of prevailing and maintaining class action status; 2) the extent to which the parties have engaged in sufficient discovery to evaluate the merits of the case and the stage of the proceedings; 3) the complexity and potential costs of trial; 4) the reaction of the class members to the proposed settlement (assessed primarily by the number and content of objections); 5) the recommendations of experienced counsel that settlement is appropriate; and, in some instances; 6) whether there was collusion or the settlement was negotiated at arm's length; and 7) the capacity for the defendant to withstand a larger judgment. Not every factor must weigh in favor of settlement for the trial judge to grant final approval; "rather, the court should consider the totality of these factors in light of the particular circumstances." Newberg §13:48. (citations omitted).

We briefly address those factors here.

### A. The Amount Of The Settlement In Light Of The Potential Recovery Risks Of Prevailing And Maintaining Class Action Status.

Plaintiffs addressed this issue in the Preliminary Approval Order submissions, and explained that the settlement was reasonable in light of the risks involved in continuing litigation. *Newberg* describes the Court's role in determining whether the settlement's value is sufficient as "(1) making a rough estimate of what the class would have received had it prevailed at trial (or at other endpoints) and then (2) discounting that value by the risks that the class would face in securing that outcome." Here, Plaintiffs' counsel reasonably assessed the potential class monetary outcome as a few thousand dollars per Plaintiff (obviously varying by length of custody and other factors). This estimate is based on the unpredictability of the size of any damages award beyond statutory damages, on the fact that any classwide award of general damages is subject to significant debate and experience in other jail damages class actions.

Plaintiffs considered their liability case to be strong, especially since California expressly applies strict scrutiny to claims of sexual orientation discrimination. *See, e.g., In re Marriage Cases*, 43 Cal. 4th 757, 839-44, 183 P.3d 384, 440-44 (2008) (classifications based on sexual orientation are a suspect classification for purposes of state constitution and are subject to strict scrutiny).[3] Defendants believed they had a substantial defense based on their contentions, which Plaintiffs disputed, that ALT inmates had made a voluntary and informed choice to be placed in the ALT, and that ALT inmates were comparable not to the general population but to protective custody inmates, who had similar restrictions to those experienced by Plaintiffs. The potential size of monetary awards beyond

---

[3] Likewise, California courts apply strict scrutiny to claims of gender based discrimination. *Woods v. Horton*, 167 Cal. App. 4th 658, 674 (2008); *Hardy v. Stumpf*, 21 Cal. 3d 1, 7 (2008); *Molar v. Gates*, 98 Cal. App. 3d 1, 16 (Cal. Ct. App.1979) ("gender-based classifications . . . must be strictly scrutinized irrespective of the nature of the interest implicated because the classifications in and of themselves are an affront to the dignity and self-respect of the members of the class set apart for disparate treatment."). And discrimination based on gender identity (e.g. one's identity as a transgender person)

9

statutory damages if the case were tried, and the number who would come forward for trial if individual monetary awards had to be litigated, is difficult to determine. Similarly, there would be ongoing litigation over whether, even if Plaintiffs' constitutional rights were violated, they were entitled to a verdict and the accompanying statutory damages under Civil Code §52.1.

Plaintiffs initially assessed the monetary recovery for the Class as good but not exceptional for a class of this size. However, Plaintiffs' counsel believed that the claim rate could go as high as 50% given the relatively small class size and the potential greater adhesiveness among class members. Given that the final claims rate was approximately half of that, the average class member recovery for those filing claims is on the high end of settlements based on the mean $4000-$5000 recovery. Comparing this recovery to other class actions for damages in the jail context involving over-detentions and strip searches, a recovery of $4000-$5000 per class members compares highly favorably. *See* Litt Declaration, ¶¶8-10.

In addition, the favorability of the outcome must be assessed in light of the outstanding injunctive relief. Injunctive relief was always the prime objective in this case. The injunctive relief terms break new ground in many respects and are a model for how jails address these issues. The parties' agreement establishes a PREA-GBTI committee whose purpose is to discuss the housing assignment, programming options, educational options, and employment options for inmates who self-identify as GBTI, including to meet with the inmate to ensure they understand their options and to determine the most appropriate housing (based on a variety of considerations, including gender identity), programming and employment options for that inmate, which could include general population housing, housing in the ALT, and for transgender inmates who identify as female, housing in female detainee units. The agreement is groundbreaking in its

---

is, by definition, discrimination on the basis of gender. *See, e.g.*, Gov. Code §12926(r)(C)(2); Cal. Penal Code §11410(b)(3); Cal Gov. Code §11135(e).

10

specificity regarding addressing the needs of transgender inmates, including the aforementioned housing assignment, choice as to the gender of deputies performing searches, and access to hormonal medication to treat gender dysphoria while in jail. The agreement addresses in detail the approach to housing and classification, work and employment, programming and time out of cell issues. It ensures equal time-out-of-cell for GBT inmates as compared to non-GBT inmates, and equal programing and work opportunities. It also provides for staff training and zero tolerance standards for staff harassment or discrimination, special considerations for transgender inmates, PREA [Prison Rape Elimination Act] compliance and advancement, and monitoring of the Agreement. See Exhibit B.

An additional factor making the settlement highly favorable to the class was that, even given the strength of Plaintiffs' claim, this case could have spread out over several years, especially if there was an appeal. In light of all the factors, Plaintiffs' counsel consider the settlement to be very much fair and reasonable. This assessment was concurred in and in fact strongly urged by the independent mediator. The settlement is certainly within the "ballpark of reasonableness." *Newberg on Class Actions*, §13.48. *See, e.g., Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012) (district court should "of course assess the plaintiffs' claims in determining the strength of their case relative to the risks of continued litigation," no specific finding of the likely recovery is required and would be "speculative and contingent").

Plaintiffs' counsels' assessment that the settlement was adequate to provide a fair recovery to all claiming class members has been borne out by the fact that the claim rate (based on dividing the number of valid claims by the number of class members) was approximately 25% of the total 655 class members, who are each receiving an average (mean) recovery of $4000-$5000.

## B. The Extent Of The Discovery Conducted

11

Plaintiffs conducted extensive documents discovery, and carefully reviewed and analyzed the documents. While depositions were not conducted, there were several meetings with Defendants' counsel and SBCSD command staff to address issues regarding jail operations, the issues they perceived as challenges and potential solutions. The SBCSD provided both formal and informal discovery concerning the general jail operations and conditions for general population inmates and the ALT. Further, Plaintiffs' counsel conducted inspections of the WVDC where GBT and non-GBT inmates are housed, and the Glen Helen Rehabilitation Center, to determine conditions of confinement for GBT and non-GBT inmates, with their expert consultant. While there were factual disagreements on certain specifics, there was not disagreement on the basic fact that, for a long time, time out of cell had been disparate between ALT inmates and similarly situated general population inmates, and that ALT inmates had significantly less programming and work opportunities than did similarly situated general population inmates. Litt Dec., ¶2.

### C. The Complexity And Potential Costs Of Trial

Plaintiffs' counsel considered this case to be complex, but as class actions go, the complexity is in the middle range.  Having said that, the complexity and potential cost of trial was not a significant factor in Plaintiffs' counsel' recommendation of approval for the settlement.

### D. The Number And Content Of Objections

There were no objections and no opt outs filed. The lack of any objection and opt-outs strongly support the conclusion that the class members are happy with the settlement and that it is fair and adequate. "The negligible number of opt-outs and objections indicates that the class generally approves of the settlement." *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 456 (C.D. Cal. 2014) (citing *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004)(affirming the approval of a

class action settlement where 90,000 members received notice and 45 objections were received); *Rodriguez v. West Publishing*, 563 F.3d 948, 967(9th Cir. 2009) ("The court had discretion to find a favorable reaction to the settlement among class members given that, of 376,301 putative class members to whom notice of the settlement had been sent, 52,000 submitted claims forms and only fifty-four [.014 percent] submitted objections"); *Chun–Hoon v. McKee Foods Corp*., 716 F.Supp.2d 848, 852 (N.D.Cal.2010) (concluding, in a case where "[a] total of zero objections and sixteen opt-outs (comprising 4.86% of the class) were made from the class of roughly three hundred and twenty-nine (329) members," that the reaction of the class "strongly supports settlement").

### E.  The Recommendations Of Experienced Counsel That Settlement Is Appropriate

Class counsel provided their credentials in support of the motion for class certification and for attorneys' fees. They are highly experienced, and highly regarded, civil rights lawyers with substantial experience in civil rights class actions. For the reasons explained here, and in the Preliminary Approval Motion and supporting documents, they concluded that the settlement was reasonable and in the best interest of the class. Without disclosing anything confidential in the mediation process, the case was settled with the intimate involvement and approval of a highly experienced mediator (former United States Magistrate Judge Carla Woehrle). This conclusion carries weight when the settlement is recommended by experienced counsel:

What counts in favor of the settlement is that *experienced* counsel— particularly counsel experienced in class action litigation—have reached it and are proposing it. In this context, courts are using "experience" as something of a proxy for both "trustworthiness" and "reasonableness"—that is, if experienced counsel reached this settlement, the court may *trust* that

13

the terms are *reasonable* in ways that it might not had the settlement been reached by lawyers with less experience in class action litigation *Newberg,* §13:53.*Criteria governing final approval—Recommendation of experienced counsel* (5th ed.) (original emphasis).

### F.  Arm's Length Negotiations And The Absence Of Collusion

From early in the case, the parties entered into settlement negotiations with the assistance of Magistrate Judge Woehrle. Numerous mediation sessions were held, both with Magistrate Judge Woehrle and directly between the parties. Agreements were reached in phases – first injunctive relief, then the damages class fund and finally attorney's fees. Judge Woehrle was involved at each stage. It is obvious that the settlement is not the result of collusion and is the result of arm's length negotiations.

### G. The Capacity For The Defendant To Withstand A Larger Judgment

Defendants' capacity to pay was not a significant factor in this settlement. San Bernardino is a large California County, and issues were never raised about its ability to pay any judgment that might ultimately be entered.

### IV.    NONE OF THE RED FLAGS IDENTIFIED AS CAUTIONS TO PROPOSED SETTLEMENTS ARE PRESENT HERE.

*Newberg* identifies, alongside the foregoing previously discussed general factors to assess a settlement's fairness, additional cautions for courts to assess that are discussed in the Manual for Complex Litigation, which sets forth a list of "recurring potential abuses in class action litigation that judges should be wary of as they review proposed settlements." *Manual for Complex Litigation*, Fourth, §21.61. At the heart of these concerns is whether "the class's attorneys have sold out the class, settling the class members' claims for too little in return for a guaranteed attorney's fee." *Newberg* §13:56. *Newberg* identifies several "red flags." *See Newberg*, §13:56-13:61; §12:7-12:13. (5th ed.). Below, we discuss each of these and briefly explain why they are factors here.

1. Reverse auctions (defendants settling for the lowest amount agreed to by one set of class counsel where there are multiple parallel actions): there was no reverse auction and there was a single set of class counsel.

2. Cumbersome claiming (making the claims process so complex that few will engage while ensuring ample fees to class counsel): the claims process here was a traditional, straightforward one where a class member completed a simple form, and claiming class members shared in a fixed fund with no reversion.

3. Differential treatment among class members (structuring the settlement by different treatment of class members not based on reasonable criteria in a way to save the defendants money, likely in return for a handsome fee for class counsel): there was no differential treatment of class members; each was entitled to a mathematically determined value based on objective factors considering the conditions and length of their time in the ALT.

4. Compromising claims without compensation (the class does not receive any compensation at all, or one part of the class receives relief while another does not): all class members were eligible to receive compensation based on a common formula.

5. Setting fees unrealistically (usually because not based on the traditional percentage of the fund or lodestar analysis, and where the class recovery is low or non-existent): Plaintiffs' claims carried statutory fee provisions under which they were entitled to a statutory fee as prevailing parties based on a lodestar analysis, and Plaintiffs' counsel substantially discounted their fee in order to effectuate the settlement.

6. Coupon settlements (relief not paid in cash in conjunction with a substantial attorneys' fee): this was a cash value settlement, not a coupon settlement.

As the foregoing demonstrates, none of these concerns apply here.

## V.  THE INJUNCTIVE RELIEF PROVISIONS ARE HIGHLY FAVORABLE TO THE CLASS.

The parties have agreed to the entry of an injunction for a period of three years. The Final Approval Order will enter an injunction, the terms of which are contained in Exhibit B to the proposed Final Approval Order. The required changes to Defendants' practices will, by Defendants' estimate, cost approximately $500,000 annually (in current dollars), which is a substantial benefit enjoyed by class members. While many damages class members are not presently in custody, this is still a benefit to them since many are at risk of re-arrest.

In the event of a change in relevant law during the three-year period that this injunction remains in effect, the County will be required to comply with any and all provisions that are more protective of class members' rights than the terms of Exhibit B.  A change in relevant law is defined as an amendment to the U.S. or California Constitutions, a change in federal or California statutory law, a change in applicable regulations (e.g., PREA regulations) or a binding decision of the U.S. Supreme Court, Ninth Circuit Court of Appeals, California Supreme Court, or California Court of Appeal.

The settlement and injunctive relief agreement provide that policies will be agreed to between the parties, with the court retaining jurisdiction to resolve differences if they cannot be agreed to. Settlement Agreement, ¶15; Injunctive Relief Agreement §9.1. The parties subsequently agreed that Defendants will begin implementing the Order as soon as the Order of Approval is entered. Regarding the policies to be developed, the parties have also agreed San Bernardino will provide draft policies within 60 days of the effective date of the settlement (which is the

date the order is entered since there are no objections, at least to date, and thus no potential appeal). After receipt of the proposed policies, Plaintiffs will respond in writing within 45 days. The parties will then meet on one or more occasions in an effort to resolve any differences of opinion. If there remain unresolved issues after six months from the effective date of the settlement, they shall be brought to the court's attention by a joint status report setting out the issues and each side's position (along with any relevant documents). The status report shall request a hearing date for the court to resolve the outstanding issues. These provisions are contained in the proposed Final Approval Order.

## VI.  THE LIMITED INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS ARE APPROPRIATE.

The proposed settlement provides a slight benefit to the 15 class representatives (ranging from $2000 to $5500 in addition to their class member formula award, depending on the role and contribution of the class representative). The proposed incentive awards are contained in the following chart (which is taken from ¶3 of the Settlement Agreement).

| NAME | INCENTIVE AWARD |
| --- | --- |
| Bryan Bagwell | $5,000 |
| Christopher Crawford | $5,000 |
| Frederick Crockan | $5,000 |
| Pedro Guzman | $3,000 |
| Michael Aka Madison Hatfield | $5,000 |
| William Kennedy | $3,000 |
| Sean Lint | $2,000 |
| Anthony Oliver | $5,500 |
| Nick Ou | $3,000 |
| Kevin Aka Veronica Pratt | $5,500 |
| Steven Aka Lynn Price | $3,000 |
| Jonathan Robertson | $3,000 |

| NAME | INCENTIVE AWARD |
|---|---|
| Illich Vargas | $5,500 |
| Tim Walker | $5,000 |
| Taheash White | $2,000 |
| **TOTAL** | **$60,500.00** |

The proposal for incentive awards was at Class Counsel's initiative, and no discussion or agreement regarding incentive awards occurred with the Named Plaintiffs until the proposed settlement was reached, and the proposed incentive awards to each Named Plaintiff reflects counsel's assessment (after discussion with each of the class representatives) of the contribution of various individual Class Representatives. Litt Dec., ¶6.

While there is a larger than normal number of class representatives, that is due to Class Counsel's judgment that there were several categories of class representatives needed in order to have both those in custody with standing to seek injunctive relief, and those not in custody in order to have damages class representatives who were not in custody and therefore not subject to PLRA restrictions. It was also Class Counsel's judgment that they needed a larger than usual number of class representatives due to the variety of deprivations at which the Complaint was aimed (e.g., drug treatment, mental health treatment, education, work opportunities), for each of which it was important to have a class representative who personally experienced that deprivation. *Ibid*.

"Incentive *awards* are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009). "Such awards …are intended to compensate … for work done on behalf of the class, …, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* In determining whether to approve an incentive award, courts may consider the following factors: (1) the risk to the class representative in commencing suit, both financial and

otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation[;] and[ ](5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation. *Van Vranken v. Atl. Richfield Co.,* 901 F.Supp. 294, 299 (N.D.Cal.1995).

Here, all Plaintiffs were (either at the time of the filing of the complaint or previously) in San Bernardino custody. Those who were presently in custody obviously took a risk of retaliation, and those not in custody were still at risk of re-arrest and retaliation in that event.  All Named Plaintiffs put their names out in the public arena. Plaintiffs' counsel spent dozens of hours interviewing primarily class representatives (and secondarily other class members) while they were in custody, potentially increasing their risk and their personal participation in the litigation. Litt Dec. ¶6.

The requested amounts are well within the range of court approved incentive payments in recognition of work done on behalf of the class and in consideration of the risk undertaken in bringing the action. "An incentive award of $5,000 per class representative is in line with other awards approved in this circuit." *Weeks v. Kellogg Co.*, No. CV 09-08102 MMM RZX, 2013 WL 6531177, at 37 (C.D. Cal. Nov. 23, 2013). *See also, e.g., In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015) (affirming $5000 incentive award even though the average class member received only $12); *In re Mego Financial Corp.,* 213 F.3d at 463 (approving a $5,000 incentive award for each class representative); *Faigman v. AT & T Mobility LLC,* No. C06–04622 MHP, 2011 WL 672648, *5 (N.D.Cal. Feb. 16, 2011) (approving an incentive payment of $3,333.33 for each of three class representatives, and noting that "[i]n [the Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable"); *Clesceri v. Beach City Investigations & Protective Services, Inc.,* 2011 WL 320998, *2 (C.D.Cal. Jan. 27, 2011) (preliminarily approving an award of $3,000 to two named plaintiffs); *Hartless v.*

*Clorox Co.,* 273 F.R.D. 630, 646–47 (S.D.Cal.2011) (approving an award of $4,000 for one named plaintiff and $2,000 for another); *Dennis v. Kellogg Co.,* No. 09–CV–1786–IEG (WMc), 2010 WL 4285011, *3 (S.D.Cal. Oct. 14, 2010) (preliminarily approving an incentive award of $5,000); *Aguayo v. Oldenkamp Trucking,* No. F04–6279 AWI LJO, 2006 WL 3020943, *10 (E.D.Cal. Oct. 17, 2006) (preliminarily approving a settlement agreement, which provided that class counsel would apply for an incentive award of no more than $5,000 for the named plaintiff).

Numerous cases have approved significantly higher incentive awards. *See, e.g., Van Vranken v. Atl. Richfield Co*., 901 F.Supp. 294, 300 (N.D.Cal.1995) (holding that incentive award of $50,000 to each named plaintiff was fair and reasonable); *Glass v. UBS Fin. Servs., Inc.,* 2007 WL 221862 (N.D.Cal. Jan.26, 2007) (approving incentive award of $25,000 for each of four named plaintiffs); *Glass v. UBS Fin. Servs., Inc.*, 2007 WL 221862, at *16 (N.D.Cal. Jan.26, 2007) (approving payments of $25,000 to each named plaintiff).

## VII.  LATE CLAIMS

There were 2 claims filed after the cutoff date of January 7, 2019 as of January 17, 2019. Keogh Dec. ¶21. Plaintiffs' counsel recommend that they be allowed because the claims rate is well under the high end of their expectation when negotiating the settlement, and it appears that some class members were incarcerated and did not receive the class notice. Litt Dec. ¶11. Accordingly, they recommend that the Court allow payment of class member claims postmarked or received by the Class Administrator as of February 11. Claims received after that date would not be paid under this proposal.

## VIII.  UPDATED ATTORNEY FEE INFORMATION

Plaintiffs filed the motion for attorneys' fees on September 18, 2017, as required by this Court's Preliminary Approval Order. That motion provided lodestar cross-check information through August 31, 2017. Substantial additional

work has occurred since then and is ongoing.  Since Plaintiffs have agreed to a flat fee far below lodestar, there is no need to provide a full summary. Plaintiffs estimate that the additional fees beyond those contained in the motion for fees will ultimately add between $100,000-$125,000 to the lodestar. Litt Dec., ¶12.

## IX.   SETTLEMENT TERMS NOT ADDRESSED IN THIS MOTION BUT CONTAINED IN THE FINAL ORDER OF APPROVAL.

There are many terms of the settlement that the settlement agreement requires be contained in the Final Order of Approval that are not addressed in this motion, as they are uncontroversial, standard terms of a Final Order of Approval. The proposed Final Order of Settlement contains a more complete discussion of the terms that should be contained in any final order than does this motion.

## X.   EFFECTIVE DATE OF THE SETTLEMENT

Only objecting class members have the right to appeal an order approving a settlement. *See Newberg on Class Actions* §14:13 (5th ed.) ("Class members who object but whose objections are rejected by the district court may seek to appeal that rejection."); *Devlin v. Scardelletti*, 536 U.S. 1, 1, 122 S. Ct. 2005 (2002) (holding that absent class members who object in a timely manner to approval of a settlement at a fairness hearing have the power to bring an appeal without first intervening; rejecting the contention that only Named Plaintiffs and formal interveners qualify as parties). Since no class member objected, no class member may appeal. Accordingly, the effective date of settlement is 30 days from the date this Order, which also constitutes the judgment in this case, is entered on the docket (see definition of "Effective Date", ¶15 of Settlement Agreement).

## XI.   CONCLUSION

For the foregoing reasons, Plaintiffs ask that the Court enter the proposed Final Approval Order with any revisions consistent with the material provisions of the Settlement Agreement that the Court deems necessary or appropriate.

DATED: January 17, 2019          Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT,   LLP
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA

By: /s/ Barrett S. Litt
     Barrett S. Litt
     Attorneys for Plaintiffs