BARRETT S. LITT, SBN 45527
blitt@kmbllaw.com
DAVID S. McLANE, SBN 124952
dmclane@kmbllaw.com
LINDSAY BATTLES, SBN 262282
lbattles@kmbllaw.com
KAYE, MCLANE, BEDNARSKI & LITT
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7600
Facsimile: (626) 844-7670

MELISSA GOODMAN, SBN 289464
MGoodman@aclusocal.org
BRENDAN M. HAMME, SBN 285293
BHamme@aclusocal.org
PETER J. ELIASBERG, SBN 189110
PEliasberg@aclusocal.org
AMANDA C. GOAD, SBN 297131
AGoad@aclusocal.org
ADITI FRUITWALA, SBN 300362
AFruitwala@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CA
1313 West 8th Street
Los Angeles, California 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5299

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAN MCKIBBEN, et al.,<br><br>Plaintiffs,<br>vs.<br><br>JOHN MCMAHON, et al.,<br><br>Defendants | Case No.14-2171-JGB-SP<br><br>[Hon. Jesus G. Bernal]<br><br>**[PROPOSED] FINAL APPROVAL ORDER; EXHIBITS**<br><br>Date:    **February 11, 2018**<br>Time:    **9:00 A.M.**<br>Place:    **Courtroom 1** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

**I.    INTRODUCTION** ........................................................1

**II.   DEFINITIONS** ...........................................................1

**III.  LITIGATION BACKGROUND AND CLASS CERTIFICATION** .........6

**IV.   SUMMARY OF SETTLEMENT TERMS AND THE SETTLEMENT'S BENEFIT TO THE CLASS** .......................................7

**V.    THE RESULTS OF THE CLAIMS PROCESS (INCLUDING OBJECTIONS AND OPT OUTS).** ..............................12

**VI.   SETTLEMENT FAIR, ADEQUATE AND REASONABLE** .................12

  *A.   THE AMOUNT OF THE SETTLEMENT IN LIGHT OF THE POTENTIAL RECOVERY (AND RISKS OF PREVAILING AND MAINTAINING CLASS ACTION STATUS.* ......................................13

  *B.   THE EXTENT OF THE DISCOVERY CONDUCTED* ...................16

  *C.   THE COMPLEXITY AND POTENTIAL COSTS OF TRIAL* ...........17

  *D.   THE REACTION OF THE CLASS AND THE NUMBER AND CONTENT OF OBJECTIONS* ......................................17

  *E.   THE RECOMMENDATIONS OF EXPERIENCED COUNSEL THAT SETTLEMENT IS APPROPRIATE* .....................................18

  *F.   ARM'S LENGTH NEGOTIATIONS AND THE ABSENCE OF COLLUSION* ......19

  *G.   THE CAPACITY FOR THE DEFENDANT TO WITHSTAND A LARGER JUDGMENT* ......................................................19

  *H.   NONE OF THE RED FLAGS TRADITIONALLY IDENTIFIED AS CAUTIONS TO PROPOSED SETTLEMENTS ARE PRESENT HERE.* .....................19

  *I.   CONCLUSION REGARDING REASONABLENESS, FAIRNESS AND ADEQUACY OF THE SETTLEMENT* ..............................20

**VII.  THE INJUNCTIVE RELIEF PROVISIONS.** ...........................20

**VIII. THE LIMITED INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS ARE APPROPRIATE ARE APPROPRIATE.** ...............22

**IX.   NOTICE** ................................................................................25

**X.    CLASS ADMINISTRATOR** .........................................................25

**XI.   EFFECTIVE DATE OF THE SETTLEMENT** .................................26

**XII.  ATTORNEYS' FEES AND COSTS** ...............................................26

**XIII. LATE CLAIMS** .........................................................................27

**XIV. PAYMENTS TO BE MADE BY DEFENDANTS** ...............................27

**XV.   GENERAL PROVISIONS** ...........................................................28

**XVI. FINAL RESOLUTION** ................................................................29

# I.   **INTRODUCTION**

This lawsuit having come before this Court for a hearing, pursuant to this Court's Orders Preliminarily Approving Proposed Settlement Between Plaintiffs and Defendant. See Doc 84 (dated Sept. 10, 2017) and Doc 84 (dated Sept. 21, 2018) (collectively the "Preliminary Approval Orders") to consider and determine the matters set forth in the Preliminary Approval Orders; and due notice of said hearing having been published and given; and all class members wishing to make objections to the proposed settlement having been given an opportunity to present such objections to the Court, and none having done so; and the Court having considered the matter, including all papers filed in connection therewith, and the oral presentations of counsel at said hearing; and good cause appearing,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

# II.   **DEFINITIONS**

1.     "Administrator" means the Class Administrator, as agreed upon (or to be agreed upon) by the Parties and appointed by the Court to review and determine the validity and amount of claims submitted by a Settlement Class Member ("SCM") (as defined herein), according to the procedures set forth herein. Plaintiffs' Counsel sent out for bids to qualified administrators and chose JND Legal Administration as the Class Administrator because they were most reasonably priced.

2. The "Alternative Lifestyle Tank" (aka the "ALT") consists of two 16-cell housing sections in one of the jail units in the West Valley Detention Center jail facility operated by the San Bernardino County Sheriff's Department that is used to house gay, bisexual and transgender ("GBT") inmates.

3. The "Bar Date" is the date by which any Damages Class Member who wishes to receive payment pursuant to the Settlement Agreement and therefore is a Settlement Class Member ("SCM") as defined below) must file his/her Proof of

1

Claim and Release Form, file objections to this Settlement Agreement, or request to be excluded from the class (opt-out). The Bar Date shall be calculated as the close of business on the 90th day after the last day of mailing of the Class Notice which is up to two consecutive business days from beginning to end, as is addressed in ¶ 33, i.e., the Class Administrator must mail all notices within a two day period).

4. "Class Counsel" herein refers to Barrett S. Litt, David S. McLane and Lindsay Battles of KAYE, McLANE, BEDNARSKI & LITT, and Melissa Goodman, Amanda Goad, Brendan Hamme and Aditi Fruitwala of the ACLU Foundation of Southern California.

5. "Class Counsel Attorneys' Fees" refers to the amount awarded by the Court as their attorneys' fees in this case, which amount has been agreed to by the parties as a separate award, to be approved by the Court.

6. "Class Counsel Litigation Costs" include, but are not limited to all litigation costs, including the following: messenger and other delivery fees; postage; photocopying; printing; scanning; document binding; parking; regular or special postage expenses; travel expenses (including mileage, airfare, lodging, meals, and ground transportation); consultants' fees; mediation charges and fees; expert witness fees; regular witness fees; deposition fees; transcript fees; investigation fees; on-line research costs; long-distance telephone charges; facsimile transmissions and other costs or expenses ordinarily charged by attorneys when representing clients, whether or not the costs qualify to be reimbursed in a motion for attorneys' fees and/or costs under either 42 U.S.C § 1988 or 28 U.S.C. § 1920. Certain costs are to be paid from the agreed upon attorneys' fee award and certain costs are to come from the Damages Class Fund.

7. The "Class Damages Fund" refers to the amount of up to $950,000 as damages compensation to the Class, to be paid by Defendants to the Class Administrator, and out of which the costs of Class Administration, Plaintiffs'

counsel expert/consulting and mediation fees, incentive awards and compensation to Damages Class members will be paid.

8. A "Class Member" means any member of the Injunctive Relief Class as defined above (which is broader than the Damages Class).

9. The "Class Notice" means the notice to the Class regarding settlement, to be sent to Class Members in a form substantially similar to that attached hereto as Exhibit B, or as otherwise approved by the Court, and such other summary notice to be published in accordance with the terms of this Settlement Agreement.

10. The "Damages Class" is composed of individuals who, between October 22, 2012 (two years prior to the filing of the original complaint, which is the statute of limitations period under 42 U.S.C. § 1983) and March 31, 2018 (the end of the month in which the settlement was reached in principle) were GBT inmates housed in the ALT of the San Bernardino County Jail facility known as West Valley Detention Center ("WVDC").

11. The "Damages Class Member List" shall consist of those persons identified as having been housed in the ALT during the Damages Class Period.

12. The "Damages Class Period" refers to October 22, 2012, through March 31, 2018.

13. The "Database" is the information provided in electronic form to the Administrator no later than five (5) days from the date the Court grants preliminary approval of the terms of this Settlement Agreement (if the data has not already been provided), which information has been compiled from the electronic records of the San Bernardino Sheriff's Department.

14. The "Defendants" are the County of San Bernardino, the San Bernardino Sheriff's Department, San Bernardino County Sheriff John McMahon, and San Bernardino County Sheriff's Department employees Greg Garland, Jeff Rose, James Mahan, and Armando Castillo.

15.     The "Effective Date" means thirty days after the date upon which a judgment entered by the Court approving the Settlement Agreement becomes final. The Judgment will be deemed final only upon expiration of the time for a Damages Class member who files an objection to file a notice of appeal (30 days after entry of judgment) or, if a Notice of Appeal is filed by an objector, upon exhaustion of all appeals and petitions for writs of certiorari. If no Damages Class member files an objection, then the Judgment shall become final as of the entry of the Final Approval Order and Judgment.

16.     The "Fairness Hearing" is the hearing on the fairness of this Settlement, which date will be set by the court.

17.     The "Final Order of Approval and Settlement" is the Order finally approving the settlement, entered by the court (which may also be referred to herein as "Final Order").

18.     The "Injunctive Relief Class" is composed of individuals who currently are, or in the future will be, GBT inmates housed in the San Bernardino County jails, including but not limited to those housed in the ALT.

19.     The "Lawsuit" refers to the action styled *McKibben et al. v. County of San Bernardino et al.*, Case No. 14-2171-JGB-SP.

20.     The "Motion for Attorneys' Fees and Costs" is Class Counsel's application for Attorneys' Fees and Costs.

21.     The "Named Plaintiffs" or "Class Representatives" refers to the plaintiffs named in the Second Amended Complaint to this suit, who are: Pedro Guzman, Nick Ou, Sean Lint, Anthony Oliver, Timothy Walker, Ilich Vargas, William Kennedy, Jonathan Robertson, Steve Aka Lynn Price, Bryan Bagwell, Christopher Crawford, Frederick Crockan, Taheash White, Michael Aka Madison Hatfield, and Kevin Aka Veronica Pratt. (Although Dan McKibben was a Named Plaintiff, he is now deceased, and is therefore being treated purely as a class member

4

and is not included as a Named Plaintiff or Class Representative.)

22. "Preliminary Approval" is the Court's determination that the Settlement is within the range of possible approval and therefore that a notice should be sent to the Class and a hearing should be held with respect to fairness.

23. The "Preliminary Approval Order" is an order entered by the court preliminarily approving the settlement, after which Class Notice, the opportunity to object and opt out, and in a Final Approval hearing are to occur.

24. An "Opt-Out" is any Damages Class Member who files a timely request for exclusion, pursuant to the terms of this Settlement Agreement, to be excluded from the Settlement Class. (If used as a verb, it refers to the process of filing such exclusion.)

25. "Released Person" means the Defendants and their affiliates, subsidiaries, predecessors, successors, and/or assigns, together with past, present and future officials, employees, representatives, attorneys, and/or agents of San Bernardino County, including John McMahon, or any of them. "Released Persons" also includes any and all insurance carriers, and/or their representatives and attorneys, for the Released Persons.

26. The "Settlement" refers to this agreement.

27. A "Settlement Class Member" ("SCM") means any member of the Damages Class as defined above (whether or not s/he files a Timely Claim form), including representatives, successors and assigns, who does not file a valid and timely Request for Exclusion as provided for in this Settlement Agreement.

28. The "Settlement Fund" is the fund established by the Class Administrator with funds transferred from Defendants from which the damages to the Class Representatives and Damages Class members will be paid. The Defendants will pay all moneys they are obligated to pay under the Preliminary Approval Order, and the settlement approved by the Court, if any, into the Settlement

Fund.

29.     A "Timely Claim" is one filed a) within the 90-day window provided by the notice to be sent to the class, and b) to the extent the Court approves, late claims (i.e., claims filed after the Class Notice period) that are filed prior to the Final Approval Hearing.

## III.   LITIGATION BACKGROUND AND CLASS CERTIFICATION

Plaintiffs are former or current (at the time of the filing of the complaint) inmates of jails operated by the San Bernardino County Sheriff's Department (hereafter "SBCSD"). SBCSD maintained and maintains an "Alternative Lifestyle Tank" (hereafter "ALT") at the West Valley Detention Center (hereafter "WVDC"), which houses inmates who self-identify as gay, bisexual, and/or transgender (hereinafter "GBT inmates"). The WVDC is the only SBCSD jail facility that houses self-identified GBT inmates who were assigned male at birth.

Plaintiffs, and the classes they represent, contend that Defendants have engaged in systematic discrimination and denial of equal treatment against GBT inmates at the WVDC. Plaintiffs contend, inter alia, that GBT inmates 1) were automatically placed in the ALT if they self-identified as GBT; 2) would have been at risk for their safety if admitted to the general population as openly GBT inmates because SBCSD did not have any means or programs to ensure their safety; 3) had no or inadequate PREA programs in place to protect GBT inmates or address particular vulnerabilities of GBT inmates placed in the general population; 4) were limited in their time-out-of-cell generally to an hour and a half per day, and often less, in contrast to similarly situated (by classification or sentencing status) general population inmates; 5) were denied the same work opportunities that were provided to similarly situated (by classification or sentencing status) general

population inmates; 6) were denied the same programming opportunities[1] that were provided to similarly situated (by classification or sentencing status) general population inmates; and 7) a comparable range of religious services to those available to the general population. Plaintiffs also contend that certain aspects of this disparate treatment continue to this day.

Because the parties were in ongoing settlement discussions, the class certification motion was filed simultaneously with the preliminary approval motion. The Court certified the following classes (Doc. 84):

> **Damages Class (Rule 23(b)(3)):** individuals who, between October 22, 2012, and March 31, 2018, were GBT inmates housed in the Alternative Lifestyles Tank (hereafter "ALT") of the San Bernardino County jail facility known as West Valley Detention Center ("WVDC").

> **Injunctive Relief Class (Rule 23(b)(2)):** individuals who currently are, or in the future will be, GBT inmates housed in the San Bernardino County jails, including but not limited to those housed in the ALT.

## IV.   SUMMARY OF SETTLEMENT TERMS AND THE SETTLEMENT'S BENEFIT TO THE CLASS

The Settlement agreement is attached as Exhibit A (and was also Exhibit A to the proposed Preliminary Approval Order). The settlement's basic terms, as they relate to Damages Class Members, are that Defendants will provide payment of a total of $950,000. From that amount, the following awards will be made by the Class Administrator, subject to court approval:

---

[1] Programming opportunities include classes in anger management, thinking for change, living skills, parenting skills, substance abuse, GED, high school diploma, literacy, automobile mechanics, bakery occupations, culinary/reading enrichment classes, computer skills, HVAC training, fire camp vocational training, employment readiness, and re-entry services.

a. Incentive awards to the 15 Named Plaintiffs, if and to the extent approved by the Court, in the amount of $60,500.00.[2]

b. Payment of the third-party class settlement administration costs (the final amount of which is $40,000).

c. Certain litigation costs, specifically the consultant/expert and mediation fees advanced by Plaintiffs' counsel, amounting to $36,304.49. (Other litigation costs will be absorbed by counsel and included in the Attorney's Fees and Costs Award.)

d. The remainder of the Class Fund ($813,195.51) shall be distributed to the class members (including Named Plaintiffs/Class Representatives) under a formula contained in Paragraphs 5-9 of the Settlement Agreement

The formula is based on awarding a certain number of points for each day a Damages Class Member spent in the ALT. Because conditions varied over time, and the severity of what Damages Class Members experienced varied by both time and virtue of what opportunities they would have received when compared to comparably classified general population inmates, points vary by which category an inmate fit into in any given day. Only one set of points apply to a given day. (See the Settlement Agreement for an itemization of the categories.) The formula for distribution is set forth in detail in ¶8 of the Settlement Agreement, which formula is approved by the Court. In summary, there are several categories of inmates based on the time of incarceration, whether the inmate was sentenced or pre-sentenced, the inmate's security classification, and at certain periods whether the inmate had a job assignment or not and whether it was a good job assignment or not. There are also distinctions based on the time of incarceration, factoring in the severity of conditions before and starting with

---

[2] Although Dan McKibben was a Named Plaintiff, he is deceased, and is being treated purely as a class member and not as a Named Plaintiff or Class Representative.

8

October 1, 2014. Daily point values were assigned to each category. The points of claiming inmates are tallied, and then a percentage of the of the Class Fund available for distribution is calculated for each claiming inmate.

Plaintiffs summarize the variations in conditions as follows: Inmates incarcerated before October 2014 endured substantially less out-of-cell time than similarly situated inmates housed outside of the ALT. (Whereas non-ALT inmates received out-of-cell time based on their security classification level, ALT-housed inmates were generally segregated even from each other, resulting in 23-hour lockdown on many days). Inmates designated as low security risk were most adversely affected by SBCSD's policies because they would have received the most out-of-cell time had they been housed outside of the ALT; inmates designated as higher security risk would have received less out-of-cell time and were therefore less adversely impacted. Accordingly, for the pre-10/14/14 time period, security classification is relevant to determining conditions of confinement and damages.

Throughout the class period, program access varied depending on sentencing status and work eligibility. All inmates, regardless of sentencing status, security classification or incarceration dates, were denied access to certain substance abuse rehab programs (AA/NA), "In-Roads" programs (only available at another SBCSD jail facility, the Glen Helen Rehabilitation Center), religious services, and volunteer work programs available to similarly-situated, general population inmates housed outside of the ALT. In addition, *sentenced* inmates (a minority of the class) were deprived of access to GED, high school diploma courses, and other educational programs available to similarly-situated, sentenced inmates housed outside of the ALT. Depending on their security classification, disciplinary history, and other factors, some sentenced inmates would also have been eligible for both vocational training courses and job assignments, had they not been housed in the ALT. A small minority of ALT-housed, work-eligible inmates received inferior job

9

assignments but were denied access to vocational training.

Despite the provisions for point calculations for each claiming class member, no class member who qualifies for payment will receive less than a total of $40 or more than a total of $10,000. The purpose of the Maximum provision is to ensure that outliers who have outsized claims do not distort the meaningfulness of the recovery to the remaining class members, and the purpose of the $40 minimum (which applies to those in the ALT even if only for a day or two) is to provide some measure of meaningful compensation if a claim is filed. (The maximum outliers were entitled to opt out and pursue their own claims if they so chose, but none did.) None of the $950,000 Damages Class Fund reverts to the County. Any funds claimed but not cashed by a Class Member within one year of payment shall be paid to an agreed-upon *cy pres* organization.

In addition, the parties have agreed to the entry of an injunction, whose terms are set forth in Exhibit D to the Proposed Preliminary Approval Order and attached to this Final Approval Order as Exhibit B. The settlement and injunctive relief agreement provide that policies will be agreed to between the parties, with the court retaining jurisdiction to resolve differences if they cannot be agreed to. Settlement Agreement, ¶ 15; Injunctive Relief Agreement § 9.1. The parties have agreed that Defendants will begin implementing the Order as soon as the Order of Approval is entered. Regarding the policies to be developed, the parties have also agreed San Bernardino will provide draft policies within 60 days of the effective date of the settlement (which is the date the order is entered since there are no objections, at least to date, and thus no potential appeal). After receipt of the proposed policies, plaintiffs will respond in writing within 45 days. The parties will then meet on one or more occasions in an effort to resolve any differences of opinion. If there remain unresolved issues after six months from the effective date of the settlement, they shall be brought to the Court's attention by a joint status

report setting out the issues and each side's position (along with any relevant documents). The status report shall request a hearing date for the court to resolve the outstanding issues.

Finally, the settlement agreement provides that Defendants shall pay Attorneys' Fees and Costs in the amount of $1,100,000 as compensation for statutory fees and certain costs pursuant to 42 U.S.C. § 1988. (The costs included in this award include all litigation costs incurred except for mediation costs, consultant/expert costs and Class Administration costs, which are being compensated from the class fund.) This fee is the subject of a separate Motion for Attorneys' Fees to be heard at the Final Approval Hearing, to be analyzed under the standards for an award of fees and costs to a prevailing plaintiff under 42 U.S.C. § 1988 and Civil Code § 52.1(h)..

The parties agree that these fees were independently negotiated with the assistance of Judge Woehrle and that, in order to effectuate this settlement, the fees were substantially discounted below the amounts that Plaintiffs would have sought as reasonable fees in an attorney's fee motion filed by Plaintiffs as the prevailing parties on the merits in the absence of a settlement. Settlement Agreement ¶ 13.

Plaintiffs filed the motion for attorneys' fees on September 18, 2017, earlier than required by this Court's Preliminary Approval Order. That motion provided lodestar cross-check information through August 31, 2017. Substantial additional work has occurred since then and is ongoing.  Since Plaintiffs have agreed to a flat fee far below lodestar, there is no need to provide a full summary. Plaintiffs estimate that the additional fees beyond those contained in the motion for fees will ultimately add between $100,000-$125,000 to the lodestar. Thus, the total lodestar exceeds $2,800,000.

11

## V.  THE RESULTS OF THE CLAIMS PROCESS (INCLUDING OBJECTIONS AND OPT OUTS).

The final class size was determined to be 660 unique class members through March 31, 2018, the damages cutoff date. The Class Notice advised class members that the class administration costs were capped at $40,000 (which was reached). When the $40,000 in class administration costs is added to the $60,500 in incentive awards and the $36,304.49 for expert/ consulting and mediation costs to be taken from the class fund, $813,195.51 remains for distribution among class members.

There are 165 approved Claim Forms from individuals identified as Settlement Class Members who filed claims within the January 7, 2019, deadline; four (4) claim forms have been denied as duplicative; 382 Claims Forms were submitted by individuals who do not appear on the Class List; two Claim Forms were missing signatures or other required information for which deficiency notices will be sent to them; and two claim forms were received with postmarks dated after January 7, 2019 (late claims).[3]

There were no objections to, and no opt outs from, the settlement.

## VI.  SETTLEMENT FAIR, ADEQUATE AND REASONABLE

Rule 23(e) mandates that a court may approve a proposed class action settlement only if it is "fair, reasonable, and adequate." Plaintiffs have identified, citing primarily *Newberg on Class Actions* §13:48 (5th ed.) and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)[4] the following factors as the key

---

[3] As of January 17, there were two such late claims. The final figure through the Final Approval hearing will be provided at that time.

[4] *Hanlon* identified the following non-exhaustive final approval factors to evaluate the fairness of the proposed settlement: "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views

12

considerations to assess the fairness, reasonableness and adequacy of the proposed settlement: 1) the amount of the settlement in light of the potential recovery discounted by the risks of prevailing and maintaining class action status;  2) the extent to which the parties have engaged in sufficient discovery to evaluate the merits of the case and the stage of the proceedings; 3) the complexity and potential costs of trial; 4) the reaction of the class members to the proposed settlement (assessed primarily by the number and content of objections); 5) the recommendations of experienced counsel that settlement is appropriate; and, in some instances; 6) whether there was collusion or the settlement was negotiated at arm's length; and 7) the capacity for the defendant to withstand a larger judgment. Not every factor must weigh in favor of settlement for the trial judge to grant final approval; "rather, the court should consider the totality of these factors in light of the particular circumstances." *Newberg* §13:48. (citations omitted).

### A. THE AMOUNT OF THE SETTLEMENT IN LIGHT OF THE POTENTIAL RECOVERY (AND RISKS OF PREVAILING AND MAINTAINING CLASS ACTION STATUS.

*Newberg* describes the Court's role in determining whether the settlement's value is sufficient as "(1) making a rough estimate of what the class would have received had it prevailed at trial (or at other endpoints) and then (2) discounting that value by the risks that the class would face in securing that outcome." Here, Plaintiffs' counsel reasonably assessed the potential class monetary outcomes as 1) no monetary recovery, 2) monetary recovery of the value of the rental differential with a slight federal interest factor; and 3) monetary recovery of the value of the rental differential with a 7% interest factor (under state law).

---

of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement."

Here, Plaintiffs' counsel reasonably assessed the potential class monetary outcome as a few thousand dollars per Plaintiff (obviously varying by length of custody and other factors). This estimate is based on the unpredictability of the size of any damages award beyond statutory damages, on the fact that any classwide award of general damages is subject to significant debate and experience in other jail damages class actions.

Plaintiffs considered their liability case to be strong, especially since California expressly applies strict scrutiny to claims of sexual orientation discrimination. *See, e.g., In re Marriage Cases*, 43 Cal. 4th 757, 839-44, 183 P.3d 384, 440-44 (2008) (classifications based on sexual orientation are a suspect classification for purposes of state constitution and are subject to strict scrutiny).[5] Defendants believed they had a substantial defense based on their contentions, which Plaintiffs disputed, that ALT inmates had made a voluntary and informed choice to be placed in the ALT, and that ALT inmates were comparable not to the general population but to protective custody inmates, who had similar restrictions to those experienced by Plaintiffs. The potential size of monetary awards beyond statutory damages if the case were tried, and the number who would come forward for trial if individual monetary awards had to be litigated, is difficult to determine. Similarly, there would be ongoing litigation over whether, even if Plaintiffs'

---

[5] Likewise, California courts apply strict scrutiny to claims of gender based discrimination. *Woods v. Horton*, 167 Cal. App. 4th 658, 674 (2008); *Hardy v. Stumpf*, 21 Cal. 3d 1, 7 (2008); *Molar v. Gates*, 98 Cal. App. 3d 1, 16 (Cal. Ct. App.1979) ("gender-based classifications . . . must be strictly scrutinized irrespective of the nature of the interest implicated because the classifications in and of themselves are an affront to the dignity and self-respect of the members of the class set apart for disparate treatment."). And discrimination based on gender identity (e.g. one's identity as a transgender person) is, by definition, discrimination on the basis of gender. *See, e.g.*, Gov. Code §12926(r)(C)(2); Cal. Penal Code §11410(b)(3); Cal Gov. Code §11135(e).

14

constitutional rights were violated, they were entitled to a verdict and the
accompanying statutory damages under Civil Code § 52.1.

Plaintiffs initially assessed the monetary recovery for the Class as good but
not exceptional for a class of this size. However, Plaintiffs' counsel believed that
the claim rate could go as high as 50% given the relatively small class size and the
potential greater adhesiveness among class members. Given that the final claims
rate was approximately half of that, the average class member recovery for those
filing claims is on the high end of settlements based on the mean $4000-$5000
recovery. Comparing this recovery to other class actions for damages in the jail
context involving over-detentions and strip searches, a recovery of $4000-$5000
per class members compares highly favorably.

In addition, the favorability of the outcome must be assessed in light of the
outstanding injunctive relief. Injunctive relief was always the prime objective in
this case. The injunctive relief terms break new ground in many respects and are a
model for how jails address these issues. The parties' agreement establishes a
PREA-GBTI committee whose purpose is to discuss the housing assignment,
programming options, educational options, and employment options for inmates
who self-identify as GBTI, including to meet with the inmate to ensure they
understand their options and to determine the most appropriate housing (based on a
variety of considerations, including gender identity), programming and
employment options for that inmate, which could include general population
housing, housing in the ALT, and for transgender inmates who identify as female,
housing in female detainee units. The agreement is groundbreaking in its
specificity regarding addressing the needs of transgender inmates, including the
aforementioned housing assignment, choice as to the gender of deputies
performing searches, and access to hormonal medication to treat gender dysphoria
while in jail. The agreement addresses in detail the approach to housing and

15

classification, work and employment, programming and time out of cell issues. It ensures equal time-out-of-cell for GBT inmates as compared to non-GBT inmates, and equal programing and work opportunities. It also provides for staff training and zero tolerance standards for staff harassment or discrimination, special considerations for transgender inmates, PREA [Prison Rape Elimination Act] compliance and advancement, and monitoring of the Agreement. See Exhibit B.

An additional factor making the settlement highly favorable to the class was that, even given the strength of Plaintiffs' claim, this case could have spread out over several years, especially if there was an appeal. In light of all the factors, Plaintiffs' counsel consider the settlement to be very much fair and reasonable. This assessment was concurred in and in fact strongly urged by the independent mediator. The settlement is certainly within the "ballpark of reasonableness." *Newberg on Class Actions*, § 13.48. *See, e.g., Lane v. Facebook, Inc*., 696 F.3d 811, 823 (9th Cir. 2012) (district court should "of course assess the plaintiffs' claims in determining the strength of their case relative to the risks of continued litigation," no specific finding of the likely recovery is required and would be "speculative and contingent").

Plaintiffs' counsels' assessment that the settlement was adequate to provide a fair recovery to all claiming class members has been borne out by the fact that the claim rate (based on dividing the number of valid claims by the number of class members) was approximately 25% of the total 655 class members, who are each receiving an average (mean) recovery of $4000-$5000..

## B.  THE EXTENT OF THE DISCOVERY CONDUCTED

Plaintiffs conducted extensive documents discovery, and carefully reviewed and analyzed the documents. While depositions were not conducted, there were several meetings with Defendants' counsel and SBCSD command staff to address issues regarding jail operations, the issues they perceived as challenges and

16

potential solutions. The SBCSD provided both formal and informal discovery concerning the general jail operations and conditions for general population inmates and the ALT. Further, Plaintiffs' counsel conducted inspections of the WVDC where GBT and non-GBT inmates are housed, and the Glen Helen Rehabilitation Center, to determine conditions of confinement for GBT and non-GBT inmates, with their expert consultant. While there were factual disagreements on certain specifics, there was not disagreement on the basic fact that, for a long time, time out of cell had been disparate between ALT inmates and similarly situated general population inmates, and that ALT inmates had significantly less programming and work opportunities than did similarly situated general population inmates.

### C.   THE COMPLEXITY AND POTENTIAL COSTS OF TRIAL

Plaintiffs' counsel considered this case to be complex, but of medium complexity as class actions go.  The complexity and potential cost of trial was not a significant factor in Plaintiffs' counsel' recommendation of approval for the settlement.

### D.   THE REACTION OF THE CLASS AND THE NUMBER AND CONTENT OF OBJECTIONS

As explained previously, there are no objections and no opt outs, which strongly supports the fairness and adequacy of the settlement. "The negligible number of opt-outs and objections indicates that the class generally approves of the settlement." *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig*., 295 F.R.D. 438, 456 (C.D. Cal. 2014) (citing *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004)(affirming the approval of a class action settlement where 90,000 members received notice and 45 objections were received); *Rodriguez v. West Publishing*, 563 F.3d 948, 967(9th Cir. 2009) ("The court had discretion to find a favorable reaction to the settlement

among class members given that, of 376,301 putative class members to whom notice of the settlement had been sent, 52,000 submitted claims forms and only fifty-four [.014 percent] submitted objections"); *Chun–Hoon v. McKee Foods Corp.*, 716 F.Supp.2d 848, 852 (N.D.Cal.2010) (concluding, in a case where "[a] total of zero objections and sixteen opt-outs (comprising 4.86% of the class) were made from the class of roughly three hundred and twenty-nine (329) members," that the reaction of the class "strongly supports settlement").

### E.    THE RECOMMENDATIONS OF EXPERIENCED COUNSEL THAT SETTLEMENT IS APPROPRIATE

Class counsel provided their credentials in support of the motion for class certification and for attorneys' fees. They are all highly experienced, and highly regarded, civil rights lawyers with substantial experience in civil rights class actions.  For the reasons explained here, and in the Preliminary Approval Motion and supporting documents, they concluded that the settlement was reasonable and in the best interest of the class. Without disclosing anything confidential in the mediation process, the case was settled with the intimate involvement and approval of a highly experienced mediator (former United States Magistrate Judge Carla Woehrle). This conclusion carries weight when the settlement is recommended by *experienced* counsel, as is the case here:

> What counts in favor of the settlement is that *experienced* counsel—particularly counsel experienced in class action litigation—have reached it and are proposing it. In this context, courts are using "experience" as something of a proxy for both "trustworthiness" and "reasonableness"—that is, if experienced counsel reached this settlement, the court may *trust* that the terms are *reasonable* in ways that it might not had the settlement been reached by lawyers with less experience in class action litigation

18

*Newberg,* § 13:53.*Criteria governing final approval—Recommendation of experienced counsel* (5th ed.) (original emphasis).

### F.  ARM'S LENGTH NEGOTIATIONS AND THE ABSENCE OF COLLUSION

From early in the case, the parties entered into settlement negotiations with the assistance of Magistrate Judge Woehrle. Numerous mediation sessions were held, both with Magistrate Judge Woehrle and directly between the parties. Agreements were reached in phases – first injunctive relief, then the damages class fund and finally attorney's fees. Judge Woehrle was involved at each stage. The settlement is not the result of collusion and is the result of arm's length negotiations.

### G.  THE CAPACITY FOR THE DEFENDANT TO WITHSTAND A LARGER JUDGMENT

Defendants' capacity to pay was not a significant factor in this settlement. San Bernardino is a large California County, and issues were never raised about its ability to pay any judgment that might ultimately be entered.

### H.  NONE OF THE RED FLAGS TRADITIONALLY IDENTIFIED AS CAUTIONS TO PROPOSED SETTLEMENTS ARE PRESENT HERE.

*Newberg* identifies, alongside the foregoing previously discussed general factors to assess a settlement's fairness additional cautions for courts to assess that are discussed in the Manual for Complex Litigation, which sets forth a list of "recurring potential abuses in class action litigation that judges should be wary of as they review proposed settlements." At the heart of these concerns is whether "the class's attorneys have sold out the class, settling the class members' claims for too little in return for a guaranteed attorney's fee."

*Newberg* identifies the following "red flags": reverse auctions (defendants settling for the lowest amount agreed to by one set of class counsel where there are multiple parallel actions), cumbersome claiming (making the claims process so complex that few will engage while ensuring ample fees to class counsel),

19

differential treatment among class members (structuring the settlement by different treatment of class members not based on reasonable criteria in a way to save the defendants money, likely in return for a handsome fee for class counsel), compromising claims without compensation (the class does not receive any compensation at all, or one part of the class receives relief while another does not), setting fees unrealistically (self-explanatory and usually not based on the traditional percentage of the fund or lodestar analysis, and where the class recovery is low or non-existent), coupon settlements (relief not paid in cash in conjunction with a substantial attorney's fee). *Newberg*, § 13:59-13:61; § 12:7-12:13. (5th ed.). None of these are present here.

## I.   CONCLUSION REGARDING REASONABLENESS, FAIRNESS AND ADEQUACY OF THE SETTLEMENT

The Settlement Agreement and the settlement set forth therein are hereby approved and found to be fair, adequate, reasonable, in the best interest of the Class as a whole, and in satisfaction of Rule 23 of the Federal Rules of Civil Procedure and due process requirements.

The settlement is highly beneficial to the class. The mean recovery for claiming class members is $4000-$5000, substantially above the average in jail conditions cases. The Injunctive Relief is addressed in Section VII *infra*, but, for the reasons discussed there, its terms are also favorable to the class. The settlement thus is reasonable, fair and adequate.

## VII.   THE INJUNCTIVE RELIEF PROVISIONS.

The parties have agreed to the entry of an injunction in the form attached as Exhibit B for a period of three years. Pursuant to the parties' agreement, the Court orders that San Bernardino County follow the provisions of Exhibit B for a period of three years. These provisions shall effective as of the entry of this Order.

The required changes to Defendants' practices will, by Defendants' estimate,

cost approximately $500,000 annually (in current dollars), which is a substantial benefit enjoyed by class members. While many damages class members are not presently in custody, this is still a benefit to them since many are at risk of re-arrest.

In the event of a change in relevant law during the three-year period that this injunction remains in effect, the County will be required to comply with any and all provisions that are more protective of class members' rights than the terms of Exhibit B.  A change in relevant law is defined as an amendment to the U.S. or California Constitutions, a change in federal or California statutory law, a change in applicable regulations (e.g., PREA regulations) or a binding decision of the U.S. Supreme Court, Ninth Circuit Court of Appeals, California Supreme Court, or California Court of Appeal.

The injunctive relief agreement provides substantial benefit to the class and provides a comprehensive approach to treatment of gay, bi-sexual and transgender inmates (which the parties describe as a model for other jails). The Court approves the injunctive relief agreement and orders that Defendants shall comply with Exhibit B for a period of three years. It similarly approves, and so orders, that the implementation will begin immediately

Regarding the policies to be developed, the parties have agreed, and the Court orders, that San Bernardino will provide draft policies within 60 days of the effective date of the settlement (which is the date this order is entered since there are no objections, at least to date, and thus no potential appeal). After receipt of the proposed policies, plaintiffs will respond in writing within 45 days. The parties will then meet on one or more occasions in an effort to resolve any differences of opinion. If there remain unresolved issues after six months from the effective date of the settlement, they shall be brought to the court's attention by a joint status report setting out the issues and each side's position (along with any relevant

21

documents). The status report shall request a hearing date for the court to resolve the outstanding issues.

The Court retains jurisdiction to enforce the provisions of Exhibit B for a period of three years.

## VIII.   THE LIMITED INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS ARE APPROPRIATE ARE APPROPRIATE.

The proposed settlement provides incentive awards to the 15 class representatives (ranging from $2000 to $5500 in addition to their class member formula award, depending on the role and contribution of the class representative). The proposed incentive awards are contained in the following chart:

| NAME | INCENTIVE AWARD |
|---|---|
| Bryan Bagwell | $5,000 |
| Christopher Crawford | $5,000 |
| Frederick Crockan | $5,000 |
| Pedro Guzman | $3,000 |
| Michael Aka Madison Hatfield | $5,000 |
| William Kennedy | $3,000 |
| Sean Lint | $2,000 |
| Anthony Oliver | $5,500 |
| Nick Ou | $3,000 |
| Kevin Aka Veronica Pratt | $5,500 |
| Steven Aka Lynn Price | $3,000 |
| Jonathan Robertson | $3,000 |
| Illich Vargas | $5,500 |
| Tim Walker | $5,000 |
| Taheash White | $2,000 |
| **TOTAL** | **$60,500.00** |

The proposal for incentive awards was at Class Counsel's initiative, and no discussion or agreement regarding incentive awards occurred with the Named Plaintiffs until the proposed settlement was reached, and the proposed incentive

awards to each Named Plaintiff reflects counsel's assessment (after discussion with each of the class representatives) of the contribution of various individual Class Representatives..

While there is a larger than normal number of class representatives, that is due to Class Counsel's judgment that there were several categories of class representatives needed in order to have both those in custody with standing to seek injunctive relief, and those not in custody in order to have damages class representatives who were not in custody and therefore not subject to PLRA restrictions. It was also Class Counsel's judgment that they needed a larger than usual number of class representatives due to the variety of deprivations at which the Complaint was aimed (e.g., drug treatment, mental health treatment, education, work opportunities), for each of which it was important to have a class representative who personally experienced that deprivation.

"Incentive *awards* are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009). "Such awards …are intended to compensate … for work done on behalf of the class, …, and, sometimes, to recognize their willingness to act as a private attorney general." In determining whether to approve an incentive award, courts may consider the following factors: (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation[;] and[ ](5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation. *Van Vranken v. Atl. Richfield Co.,* 901 F.Supp. 294, 299 (N.D.Cal.1995).

Here, all Plaintiffs were (either at the time of the filing of the complaint or previously) in San Bernardino custody. Those who were presently in custody took a risk of retaliation, and those not in custody were still at risk of re-arrest and

retaliation in that event.  All named plaintiffs put their names out in the public arena. Plaintiffs' counsel spent dozens of hours interviewing primarily class representatives (and secondarily other class members) while they were in custody, potentially increasing their risk and their personal participation in the litigation.

The requested amounts are within the range of court approved incentive payments in recognition of work done on behalf of the class and in consideration of the risk undertaken in bringing the action. "An incentive award of $5,000 per class representative is in line with other awards approved in this circuit." *Weeks v. Kellogg Co.*, No. CV 09-08102 MMM RZX, 2013 WL 6531177, at 37 (C.D. Cal. Nov. 23, 2013). *See also, e.g., In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015) (affirming $5000 incentive award even though the average class member received only $12); *In re Mego Financial Corp.,* 213 F.3d at 463 (approving a $5,000 incentive award for each class representative); *Faigman v. AT & T Mobility LLC,* No. C06–04622 MHP, 2011 WL 672648, *5 (N.D.Cal. Feb. 16, 2011) (approving an incentive payment of $3,333.33 for each of three class representatives, and noting that "[i]n [the Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable"); *Clesceri v. Beach City Investigations & Protective Services, Inc.,* 2011 WL 320998, *2 (C.D.Cal. Jan. 27, 2011) (preliminarily approving an award of $3,000 to two named plaintiffs); *Hartless v. Clorox Co.,* 273 F.R.D. 630, 646–47 (S.D.Cal.2011) (approving an award of $4,000 for one named plaintiff and $2,000 for another); *Dennis v. Kellogg Co.,* No. 09–CV–1786–IEG (WMc), 2010 WL 4285011, *3 (S.D.Cal. Oct. 14, 2010) (preliminarily approving an incentive award of $5,000); *Aguayo v. Oldenkamp Trucking,* No. F04–6279 AWI LJO, 2006 WL 3020943, *10 (E.D.Cal. Oct. 17, 2006) (preliminarily approving a settlement agreement, which provided that class counsel would apply for an incentive award of no more than $5,000 for the named plaintiff).

24

Numerous cases have approved significantly higher incentive awards. *See, e.g., Van Vranken v. Atl. Richfield Co.*, 901 F.Supp. 294, 300 (N.D.Cal.1995) (holding that incentive award of $50,000 to each named plaintiff was fair and reasonable); *Glass v. UBS Fin. Servs., Inc.,* 2007 WL 221862 (N.D.Cal. Jan.26, 2007) (approving incentive award of $25,000 for each of four named plaintiffs); *Glass v. UBS Fin. Servs., Inc.*, 2007 WL 221862, at *16 (N.D.Cal. Jan.26, 2007) (approving payments of $25,000 to each named plaintiff).

## IX.   NOTICE

As required by this Court in its Preliminary Approval Order: (a) the Class Administrator sent Class Notices (in the form approved by the Court) by regular mail by to all persons identified from law enforcement records as class members; and (b) in lieu of publishing a summary Class Notice in local newspapers, Class and Settlement Notice was emailed to class members for whom the Class Administrator was able to reasonably and cost effectively gather email addresses.

The notice given to the Class Members was fully in compliance with the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process and is found to be the best notice practicable under the circumstances and to constitute due and sufficient notice to all parties entitled thereto

Due and adequate notice of the proceedings having been given to the Class and a full opportunity having been offered to the Class to participate in this hearing, it is hereby determined that all Class Members (since none have opted out) are bound by this Final Order of Approval and Settlement.

## X.   CLASS ADMINISTRATOR

The Court reaffirms the appointment of JND Legal Administration as Class Administrator. JND shall preserve all written communications from Class Members in response to the Class for at least three years or pursuant to further order of the Court. All written communications received by the Claims

25

Administrator from Class Members relating to the Settlement Agreement shall be available at all reasonable times for inspection and copying by Counsel for the Parties.

The Class Administrator has performed all tasks required of it, including establishing a website and call-in numbers, posting the relevant materials to the website, mailing and emailing class notices and following up, and processing claims.

The Court approves a total payment to the Class Administrator of $40,000. This shall be taken from the Class Fund. This amount includes future work yet to be performed by the Class Administrator.

At the conclusion of the Class Distribution, the Class Administrator shall submit a report to the Court summarizing the payments made to the Class.

## XI. EFFECTIVE DATE OF THE SETTLEMENT

Only objecting class members have the right to appeal an order approving a settlement. *See Newberg on Class Actions* §14:13 (5th ed.) ("Class members who object but whose objections are rejected by the district court may seek to appeal that rejection."); *Devlin v. Scardelletti*, 536 U.S. 1, 1, 122 S. Ct. 2005 (2002) (holding that absent class members who object in a timely manner to approval of a settlement at a fairness hearing have the power to bring an appeal without first intervening; rejecting the contention that only Named Plaintiffs and formal interveners qualify as parties). Since no class member objected, no class member may appeal. Accordingly, the effective date of settlement is the date this Order, which also constitutes the judgment in this case, is entered on the docket.

## XII. ATTORNEYS' FEES AND COSTS

The Court finds that the agreed upon $1,100,000 fee (inclusive of some litigation costs) is fair, reasonable and adequate and approves them. Plaintiffs' counsel are entitled to statutory fees as the prevailing party under 42 U.S.C. §1988

26

or Civil Code §52.1(h). Given the substantial discount from Plaintiffs' counsel's lodestar, there is no need to determine the exact amount that would constitute a reasonable fee, as it clearly would be more substantial than those awarded under the parties' agreement.

The Court awards Plaintiffs' counsel $1,100,000 in attorney's fees and litigation costs (exclusive of expert fees and mediation costs). The requested (and agree upon fee) is substantially less than the amount that would be as a reasonable fee to a prevailing party. See Order on Motion for Attorney's Fees for further details.

## XIII.  LATE CLAIMS

There were two claims filed after the cutoff date of January 7, 2019 as of January 17, 2019. Plaintiffs' counsel recommend that they be allowed because the claims rate is well under the high end of their expectation when negotiating the settlement and it appears that some class members were incarcerated and did not receive the class notice. Accordingly, the Court will allow payment of class member claims postmarked or received by the Class Administrator as of February 11. Claims received after that date will not be paid.

## XIV.  PAYMENTS TO BE MADE BY DEFENDANTS

Within 30 days of the effective date of the settlement, Defendants shall make the following payments (by either overnight mail or wire transfer).:

1. Payment of $913,695.51 (the difference between the $950,000 Class Fund and the $36,304.49 reimbursement of expert and mediation costs to Class Counsel) to JND Legal Administration, to be distributed as follows:

   a. $60,500 for the total incentive awards to the Named Plaintiffs (which JND shall in turn distribute to that Plaintiff along with that class member's share of the Class Fund award).

     b. $40,000 to JND (which to date has not received any payment for its services) for its past and future services.

     c. The remainder to be paid to Class Members who filed timely claims (which is defined as claims received by JND as of February 11, 2019).

2. $1,136,304.49 for attorneys' fees and litigation costs (which figure includes litigation costs for expert and mediation costs being paid from the Class Fund) to the Kaye, McLane, Bednarski & Litt Client Trust Account.

As provided in ¶ 42 of the Settlement Agreement, where Damages Class Members make claims, but do not cash their checks, the Class Administrator will make efforts to reach them and assist them to do so. The funds from checks that have not been cashed within one year of issuance shall go to an agreed upon Cy Pres Organizations.

## XV. **GENERAL PROVISIONS**

Claim forms not received or postmarked by February 11. 2019, shall not be paid, although such persons shall nonetheless be bound by this Order.

All class members shall be bound by this Order.

Except as otherwise provided in this Order, each party shall bear its own costs, expenses and attorneys' fees.

The Class Administrator will prepare a list of all rejected claims, with the reasons for rejection, and maintain the list in its case file.

The Court reserves and maintains jurisdiction over this settlement and its provisions, and over the claims administration and distribution of the funds. Disagreements between the parties on any disputes or unresolved aspects of this Order as it relates to monetary relief shall be brought to this Court for resolution.

The use of the masculine gender herein is construed to include the feminine

28

and/or the neuter where applicable. The use of the singular herein is to be construed to include the plural where applicable. The use of the plural herein shall be construed to include the singular where applicable.

## XVI. FINAL RESOLUTION

The monetary relief provided for in this Order shall compensate for all alleged violations of rights and all claims by the Damages Class Members on matters alleged in the lawsuit under any theory of liability that come within the Damages Class definition, except as to monetary damages for those class members who opted out.

The Court hereby dismisses the lawsuit on the merits, with prejudice, and without further costs, with such dismissal subject only to compliance by the Parties with the terms and conditions of the Settlement Agreement and this Final Order of Approval and Settlement.

The Damages Class Members, and their agents, attorneys and assigns, are hereby severally and permanently barred and enjoined, to the fullest extent permitted by law, from filing, commencing, instituting, maintaining, prosecuting, asserting or participating in a lawsuit or any other proceeding against the Defendants, including the employees, entities, agents, attorneys and insurers of Defendants and all Released Persons as defined in numbered ¶ 26 above, involving or based on any of the claims encompassed by the complaint in this case, or in any way arising out of the facts alleged, or in any way related to the claims for relief pleaded, in the operative Complaint, which are fully incorporated herein by reference.

The Named Plaintiffs and each Class Member waive all rights or benefits which he or she now has or in the future may have under the terms of California Civil Code §1542, arising from, alleged in, or pertaining to the matters alleged in the Lawsuit, that come within the Damages Class definition, except as to monetary

29

damages for those class members who have opted out. Section 1542 reads:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

Each Defendant and other Released Person are hereby released from all claims for damages or other relief which any Class Member (other than opt outs) had, has, or may have in the future, against such Defendant or other Released Person in any way arising out of the facts alleged, or in any way related to the claims for relief pleaded, in the operative Complaint;

The Defendants, and all of their agents, attorneys and assigns, waive and release any and all claims or rights to pursue, initiate, prosecute, or commence any action or proceeding before any court, administrative agency or other tribunal, or to file any complaint regarding acts or omissions, by the Plaintiffs in any of the cases covered in this Settlement, by any Represented Individuals as defined herein, and by any Class Members, with respect to any matters related to the matters alleged in the lawsuit complaint, including waiver of the right to file a malicious prosecution action; and further, as it relates to this waiver or Release, expressly waive the provisions of California Civil Code §1542 recited in the previous paragraph.

Plaintiffs have not relied upon the advice of Class Counsel as to the legal and/or tax consequences of this settlement, the payment of any money by the Defendants or the distribution of the Settlement Funds.

Neither this Final Order of Approval, the Settlement Agreement, nor any of its terms or the negotiations or papers related thereto shall constitute evidence or an admission by any Defendant that any acts of wrongdoing have been committed, and they shall not be deemed to create any inference that there is any liability

therefore. Neither this Final Order of Approval and Settlement, nor the Settlement Agreement, nor any of its terms or the negotiations or papers related thereto shall be offered or received in evidence or used for any purpose whatsoever, in this or any other matter or proceeding in any court, administrative agency, arbitration, or other tribunal, other than as expressly set forth in the Settlement Agreement.

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court finds that there is no just reason for delay and therefore directs entry of this Final Order of Approval and Settlement. Inasmuch as this Order disposes of all claims asserted in the Lawsuit, the Court further directs the Clerk to enter an order of dismissal with prejudice pursuant to F.R.Civ.P Rule 41(a)(1)(2) with the Court retaining jurisdiction as previously indicated.

DATED: _____          _____
                                 JESUS G. BERNAL, JUDGE
                                 UNITED STATES DISTRICT COURT


SUBMITTED BY:

**KAYE, McLANE, BEDNARSKI & LITT**
**ACLU FOUNDATION OF SOUTHERN CALIFORNIA**


By:___/s/  Barrett S. Litt_____
        Barrett S. Litt
    Attorneys for Plaintiffs

**Exhibit A**

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAN MCKIBBEN, *et al.*, | Case No.14-2171-JGB-SP |
| Plaintiffs, | [Hon. Jesus G. Bernal] |
| vs. | **SETTLEMENT AGREEMENT** |
| JOHN MCMAHON, *et al.*, | |
| Defendants. | |

Plaintiffs[1] Pedro Guzman, Nick Ou, Sean Lint, Anthony Oliver, Timothy Walker, Ilich Vargas, William Kennedy, Jonathan Robertson, Steve Aka Lynn Price, Bryan Bagwell, Christopher Crawford, Frederick Crockan, Taheash White, Michael Aka Madison Hatfield, and Kevin Aka Veronica Pratt, (individually and on behalf of the classes to be certified in connection with this Settlement (collectively "Plaintiffs")) and Defendants County of San Bernardino, its Sheriff John McMahon, and San Bernardino Sheriff's Department personnel Greg Garland, Jeff Rose, James Mahan and Armando Castillo (collectively "Defendants"), by and through their respective counsel, hereby submit the following Settlement Agreement ("Settlement Agreement").

---

[1] Plaintiff Dan McKibben unfortunately passed away while this lawsuit was pending, and so is not listed as Class Representative Plaintiff, although we continue to use his name as the Case Name.

1

# I.   RECITALS

Plaintiffs are former or current (at the time of the filing of the complaint) inmates at the San Bernardino County Jail (hereafter "Jail"), operated by the San Bernardino County Sheriff's Department (hereafter "SBCSD"). The Jail maintained and maintains an "Alternative Lifestyle Tank" (hereafter "ALT") at the West Valley Detention Center (hereafter "WVDC"), which houses inmates who self-identify as gay, bisexual, and/or transgender (hereinafter "GBT inmates"). The WVDC is the only SBCSD jail facility that houses a separate unit for self-identified GBT inmates who were assigned male at birth.

Plaintiffs, and the classes they represent, contend that Defendants engage in systematic discrimination and denial of equal treatment against GBT inmates at the WVDC. Plaintiffs contend, inter alia, that GBT inmates 1) were automatically placed in the ALT if they self-identified as GBT; 2) would have been at risk for their safety if admitted to the general population as openly GBT inmates because SBCSD did not have any plans or programs to ensure their safety; 3) had no or inadequate PREA programs in place to protect GBT inmates or address particular vulnerabilities of GBT inmates placed in the general population; 4) were limited in their time-out-of-cell generally to an hour and a half per day, and often less, in contrast to similarly situated (by classification or sentencing status) general population inmates; 5) were denied the same work opportunities that were provided to similarly situated (by classification or sentencing status) general population inmates; 6) were denied the same programming opportunities[2] that were provided to similarly situated (by classification or sentencing status) general population inmates; and 7) a comparable range of religious services to those available to the

---

[2] Programming opportunities include classes in anger management, thinking for change, living skills, parenting skills, substance abuse, GED, high school diploma, literacy, automobile mechanics, bakery occupations, culinary/reading enrichment classes, computer skills, HVAC training, fire camp vocational training, employment readiness, substance abuse, "In-Roads", and re-entry services.

general population. Plaintiffs also contend that certain aspects of this disparate treatment continue to this day.

In the interest of avoiding expense, delay and inconvenience of further litigation of issues raised in this action, and without any admission of liability by Defendants, and in reliance upon the representations contained herein, and in consideration of the mutual promises, covenants and obligations in this Agreement, and for good and valuable consideration, Plaintiffs and Defendants, through their undersigned counsel, enter into this Settlement Agreement, subject to the approval of the Court.

In summary, this settlement provides for dismissal of this case with prejudice in exchange for 1) a variety of policy changes, 2) a damages settlement of $950,000, and, 3) an award of attorney's fees and costs of $1,100,000.

## II.    DEFINITIONS

The listed terms used throughout this Stipulation of Settlement and Dismissal are intended to have the following meanings:

1.  "Administrator" means the Class Administrator, as agreed upon (or to be agreed upon) by the Parties and appointed by the Court to review and determine the validity and amount of claims submitted by a Settlement Class Member ("SCM") (as defined herein), according to the procedures set forth herein. Plaintiffs' Counsel sent out for bids to qualified administrators and chose JND Legal Administration as the Class Administrator because they were most reasonably priced.

2.  The "Alternative Lifestyle Tank" (aka the "ALT") consists of two 16-cell housing sections in one of the jail units in the West Valley Detention Center jail facility operated by the San Bernardino County Sheriff's Department that is used to house gay, bisexual and transgender ("GBT") inmates.

3.  The "Bar Date" is the date by which any Damages Class Member who wishes to receive payment pursuant to the Settlement Agreement and therefore is a Settlement Class Member ("SCM") as defined below) must

file his/her Proof of Claim and Release Form, file objections to this Settlement Agreement, or request to be excluded from the class (opt-out). The Bar Date shall be calculated as the close of business on the 90th day after the last day of mailing of the Class Notice which is up to two consecutive business days from beginning to end, as is addressed in ¶ 33, i.e., the Class Administrator must mail all notices within a two day period).

4. "Class Counsel" herein refers to Barrett S. Litt, David S. McLane and Lindsay Battles of KAYE, McLANE, BEDNARSKI & LITT, and Melissa Goodman, Amanda Goad, Brendan Hamme and Aditi Fruitwala of the ACLU Foundation of Southern California.

5. "Class Counsel Attorneys' Fees" refers to the amount awarded by the Court as their attorneys' fees in this case, which amount has been agreed to by the parties as a separate award, to be approved by the Court.

6. "Class Counsel Litigation Costs" include, but are not limited to all litigation costs, including the following: messenger and other delivery fees; postage; photocopying; printing; scanning; document binding; parking; regular or special postage expenses; travel expenses (including mileage, airfare, lodging, meals, and ground transportation); consultants' fees; mediation charges and fees; expert witness fees; regular witness fees; deposition fees; transcript fees; investigation fees; on-line research costs; long-distance telephone charges; facsimile transmissions and other costs or expenses ordinarily charged by attorneys when representing clients, whether or not the costs qualify to be reimbursed in a motion for attorneys' fees and/or costs under either 42 U.S.C § 1988 or 28 U.S.C. § 1920. Certain costs are to be paid from the agreed upon attorney's fee award and certain costs are to come from the Damages Class Fund.

7. The "Class Damages Fund" refers to the amount of up to $950,000 as damages compensation to the Class, to be paid by Defendants to the Class Administrator, and out of which the costs of Class Administration,

Plaintiffs' counsel expert/consulting and mediation fees, incentive awards and compensation to Damages Class members will be paid.

8. A "Class Member" means any member of the Injunctive Relief Class as defined above (which is broader than the Damages Class).

9. The "Class Notice" means the notice to the Class regarding settlement, to be sent to Class Members in a form substantially similar to that attached hereto as Exhibit B, or as otherwise approved by the Court, and such other summary notice to be published in accordance with the terms of this Settlement Agreement.

10. The "Damages Class" is composed of individuals who, between October 22, 2012 (two years prior to the filing of the original complaint, which is the statute of limitations period under 42 U.S.C. § 1983) and March 31, 2018 (the end of the month in which the settlement was reached in principle) were GBT inmates housed in the ALT of the San Bernardino County Jail facility known as West Valley Detention Center ("WVDC").

11. The "Damages Class Member List" shall consist of those persons identified as having been housed in the ALT during the Damages Class Period.

12. The "Damages Class Period" refers to October 22, 2012, through March 31, 2018.

13. The "Database" is the information provided in electronic form to the Administrator no later than five (5) days from the date the Court grants preliminary approval of the terms of this Settlement Agreement (if the data has not already been provided), which information has been compiled from the electronic records of the San Bernardino Sheriff's Department.

14. The "Defendants" are the County of San Bernardino, the San Bernardino Sheriff's Department, San Bernardino County Sheriff John McMahon, and San Bernardino County Sheriff's Department employees Greg Garland, Jeff Rose, James Mahan, and Armando Castillo.

15. The "Effective Date" means thirty days after the date upon which a judgment entered by the Court approving the Settlement Agreement becomes final. The Judgment will be deemed final only upon expiration of the time for a Damages Class member who files an objection to file a notice of appeal (30 days after entry of judgment) or, if a Notice of Appeal is filed by an objector, upon exhaustion of all appeals and petitions for writs of certiorari. If no Damages Class member files an objection, then the Judgment shall become final as of the entry of the Final Approval Order and Judgment.

16. The "Fairness Hearing" is the hearing on the fairness of this Settlement, which date will be set by the court.

17. The "Final Order of Approval and Settlement" is the Order finally approving the settlement, entered by the court (which may also be referred to herein as "Final Order").

18. The "Injunctive Relief Class" is composed of individuals who currently are, or in the future will be, GBT inmates housed in the San Bernardino County jails, including but not limited to those housed in the ALT.

19. The "Lawsuit" refers to the action styled *McKibben et al. v. County of San Bernardino et al.*, Case No. 14-2171-JGB-SP.

20. The "Motion for Attorneys' Fees and Costs" is Class Counsel's application for Attorneys' Fees and Costs.

21. The "Named Plaintiffs" or "Class Representatives" refers to the plaintiffs named in the Second Amended Complaint to this suit, who are: Pedro Guzman, Nick Ou, Sean Lint, Anthony Oliver, Timothy Walker, Ilich Vargas, William Kennedy, Jonathan Robertson, Steve Aka Lynn Price, Bryan Bagwell, Christopher Crawford, Frederick Crockan, Taheash White, Michael Aka Madison Hatfield, and Kevin Aka Veronica Pratt. (Although Dan McKibben was a Named Plaintiff, he is now deceased, and is therefore being treated purely as a class member and is not included as a Named

Plaintiff or Class Representative.)

22. "Preliminary Approval" is the Court's determination that the Settlement is within the range of possible approval and therefore that a notice should be sent to the Class and a hearing should be held with respect to fairness.

23. The "Preliminary Approval Order" is an order entered by the court preliminarily approving the settlement, after which Class Notice, the opportunity to object and opt out, and in a Final Approval hearing are to occur.

24. An "Opt-Out" is any Damages Class Member who files a timely request for exclusion, pursuant to the terms of this Settlement Agreement, to be excluded from the Settlement Class. (If used as a verb, it refers to the process of filing such exclusion.)

25. The "Proof of Claim Form" means the Proof of Claim and Release Form required to be used in order to make a claim for payment under this settlement. A copy of the proposed Proof of Claim Form is attached as Exhibit C. The pre-prepared Claim forms shall be bar coded to link with the Class member's database information and shall contain the damages to which the class member is entitled if s/he were to receive the full damages provided for in this agreement.

26. "Released Person" means the Defendants and their affiliates, subsidiaries, predecessors, successors, and/or assigns, together with past, present and future officials, employees, representatives, attorneys, and/or agents of San Bernardino County, including John McMahon, or any of them. "Released Persons" also includes any and all insurance carriers, and/or their representatives and attorneys, for the Released Persons.

27. The "Settlement" refers to this agreement.

28. A "Settlement Class Member" ("SCM") means any member of the Damages Class as defined above (whether or not s/he files a Timely Claim form), including representatives, successors and assigns, who does not file a

7

valid and timely Request for Exclusion as provided for in this Settlement Agreement.

29. The "Settlement Fund" is the fund established by the Class Administrator with funds transferred from Defendants from which the damages to the Class Representatives and Damages Class members will be paid. The Defendants will pay all moneys they are obligated to pay under the Preliminary Approval Order, and the settlement approved by the Court, if any, into the Settlement Fund.

30. A "Timely Claim" is one filed a) within the 90-day window provided by the notice to be sent to the class, and b) to the extent the Court approves, late claims (i.e., claims filed after the Class Notice period) that are filed prior to the Final Approval Hearing.

### III.    DISCLAIMER OF LIABILITY

1.      The Parties acknowledge and agree that all undertakings and agreements contained in this Settlement Agreement have been agreed to solely for the purpose of finally compromising all questions, disputes and issues between them relating to the litigation. This Settlement Agreement and any proceedings taken pursuant hereto shall not in any event be construed as, interpreted as, or deemed to be evidence of an admission or concession by either party for any purpose, or deemed to constitute a waiver of any legal position or any defenses or other rights which either of the Parties might otherwise assert in any context. Neither this Settlement Agreement nor any provision contained therein, nor any documents related hereto, nor any negotiations, statements or testimony taken in connection herewith may be offered or received as evidence, or used for any other purpose, or in any suit, action or legal proceeding which either of them have or in the future may have with any other person, as an admission or concession of liability or wrongdoing on the part of either party, except in connection with any action or legal proceeding to enforce this settlement agreement. The Parties have reached this settlement through arms-length negotiations and to avoid the costs and

delays of further disputes, litigation and negotiations among them and after extensive negotiations with an independent mediator, subject to approval by the Court. This Settlement Agreement has been entered into without any concession of liability or nonliability whatsoever and has no precedential or evidentiary value whatsoever.

## IV.    FINANCIAL TERMS OF SETTLEMENT AGREEMENT

2.    The "Class Fund" (defined previously) is the amount of $950,000. The Class Administration Costs (estimated at a maximum approximately $40,000 and likely less depending on certain factors) shall be paid out of that fund, as will the consultant/expert and mediation fees advanced by Plaintiffs' counsel and any incentive awards to the class representatives as approved by the Court. (Other litigation costs will be absorbed by counsel and included in the Attorney's Fees and Costs Award.) The remainder of the Class Fund shall be distributed to the class members (including Named Plaintiffs/Class Representatives) under the formula terms provided in this Agreement (hereafter referred to as the "Remainder").

3.    Plaintiffs' counsel will propose the following Incentive Awards to Named Plaintiffs, which vary according to counsel's assessment of the contribution made by each to the case:

| NAME | INCENTIVE AWARD |
| --- | --- |
| Bryan Bagwell | $5,000 |
| Christopher Crawford | $5,000 |
| Frederick Crockan | $5,000 |
| Pedro Guzman | $3,000 |
| Michael Aka Madison Hatfield | $5,000 |
| William Kennedy | $3,000 |
| Sean Lint | $2,000 |
| Anthony Oliver | $5,500 |
| Nick Ou | $3,000 |
| Kevin Aka Veronica Pratt | $5,500 |

| NAME | INCENTIVE AWARD |
|---|---|
| Steven Aka Lynn Price | $3,000 |
| Jonathan Robertson | $3,000 |
| Illich Vargas | $5,500 |
| Tim Walker | $5,000 |
| Taheash White | $2,000 |
| **TOTAL** | **$60,500.00** |

4.      Plaintiffs estimate that the size of the Remainder is approximately $812,500, or slightly more. This is based on the foregoing cost for Inventive Awards, expert/consulting and mediation costs of approximately $37,000 and a Class Administration fee of a maximum approximately $40,000 and likely less, depending on a variety of factors. (The bid from the agreed to Class Administrator, JND Legal Administrator, along with its bid and related material, which are attached as Exhibit E.)

5.      The formula for distribution of the Remainder has been developed by Plaintiffs' Counsel and, if approved by the court, will be that summarized in the Class Notice to be sent to class members. The formula is designed to account for the fact that the alleged severity of challenged conditions varied: (1) over time (with the most allegedly discriminatory and restrictive conditions occurring before October 2014); and, (2) depending, in part, on inmates' sentencing status, security classification, and work eligibility (with sentenced, work-eligible inmates allegedly experiencing the most discriminatory conditions).

6.      To briefly summarize Plaintiffs' counsel's assessment of these variations in conditions, which are factored into the class damages allocation formula, are as follows:

a.          Inmates incarcerated before 10/14/2014 endured substantially less out-of-cell time than similarly situated inmates housed outside of the ALT. (Whereas non-ALT inmates received out-of-cell time based on their security classification level,

10

ALT-housed inmates were generally segregated even from each other, resulting in 23-hour lockdown on many days).

b. Inmates designated as low security risk were most adversely affected by SBCSD's policies because they would have received the most out-of-cell time had they been housed outside of the ALT; inmates designated as higher security risk would have received less out-of-cell time and were therefore less adversely impacted. Accordingly, for the pre-10/14/14 time period, security classification is relevant to determining conditions of confinement and damages.

c. Throughout the class period, program access varied depending on sentencing status and work eligibility. All ALT inmates, regardless of sentencing status, security classification or incarceration dates, were denied access to certain substance abuse rehab programs (AA/NA), "In-Roads" programs, religious services, and volunteer work programs available to similarly-situated, general population inmates housed outside of the ALT.

d. In addition, *sentenced* inmates (a minority of the class) were deprived of access to GED, high school diploma courses, and other educational programs available to similarly-situated, sentenced inmates housed outside of the ALT.

e. Depending on their security classification, disciplinary history, and other factors, some sentenced inmates would also have been eligible for both vocational training courses and job assignments, had they not been housed in the ALT. A small minority of ALT-housed, work-eligible inmates received inferior job assignments but were denied access to vocational training.

Case 5:14-cv-02171-JGB-SP   Document 91-2   Filed 06/25/19   Page 48 of 72   Page ID #:1857

7.     Defendants have a different interpretation of the factual assessment made by Plaintiffs' counsel in paragraph 6, but Defendants agree that Plaintiffs' counsel's division of points based on temporal changes in the conditions of confinement is a reasonable means of distributing settlement proceeds to the class members.

8.     Based on these considerations, Plaintiffs' counsel divide conditions of confinement into nine categories. Each of the nine categories is assigned a point-value, which will translate to a per-diem dollar value at the time of distribution. The chart below shows the daily categories, conditions associated with each category, and points assigned to each condition. Class members receive the designated number of points for each day they were incarcerated in a given category (some inmates may have incarceration days in multiple categories depending on whether their security classification, sentencing status or work-eligibility changed; inmates may also have been incarcerated before and after 10/14/14). Each day of incarceration can qualify for only one category.

| # | Per Diem Category | Disparate Conditions of Confinement | Total Per Diem Points |
|---|---|---|---|
| | | **PRE-OCTOBER 1, 2014 (DISPARATE REDUCTION IN TIER TIME)** | |
| 1. | Sentenced, work-eligible inmates | • Excluded from jobs **and** vocational training available to similarly-situated, non-ALT inmates (30)<br>• Excluded from GED, high-school diploma and other educational programs available to similarly situated, *sentenced* inmates (15)<br>• Excluded from alcohol/drug rehab, religious services, and volunteer worker positions available to non-ALT, general population inmates (20)<br>• Drastic reduction in tier time due to mixing of classification levels, often resulting in 23-hour lockdown.[3] (35) | 100 |

---

[3]Plaintiffs' counsel have presumed that all work-eligible inmates were deemed a low security risk because only those inmates with security classification scores and minimal disciplinary history were entitled to work assignments. Accordingly, we group work-eligible inmates among those most affected by the reduction in tier time.

| # | Per Diem Category | Disparate Conditions of Confinement | Total Per Diem Points |
|---|---|---|---|
| 2. | **Sentenced inmates (not work-eligible)** | • Excluded from GED, high-school diploma and other educational programs available to similarly-situated, sentenced inmates.  (15) <br> • Excluded from alcohol/drug rehab, religious services, and volunteer worker positions available to non-ALT, general population inmates. (20) <br> • Substantial reduction in tier time due to mixing of classification levels, often resulting in 23-hour lockdown.[4] (25) | **60** |
| 3. | **Pre-sentenced inmates, lower security risk (GP 6, 7)** | • Excluded from alcohol/drug rehab, religious services, and volunteer worker positions available to non-ALT, general population inmates. (20) <br> • Drastic reduction in tier time due to mixing of classification levels, often resulting in 23-hour lockdown. (35) | **55** |
| 4. | **Pre-sentenced inmates; higher security risk (GP 3,4,5)** | • Excluded from alcohol/drug rehab, religious services, and volunteer worker positions available to non-ALT, general population inmates. (20) <br> • Substantial reduction in tier time due to mixing of classification levels, often resulting in 23-hour lockdown. (25) | **45** |
| 5. | **Pre-sentenced inmates; unknown security risk** | • Excluded from alcohol/drug rehab, religious services, and volunteer worker positions available to non-ALT, general population inmates. (20) <br> • Substantial reduction in tier time due to mixing of classification levels, often resulting in 23-hour lockdown.[5] (25) | **45** |
| | **POST-OCTOBER 1, 2014** | | |

---

[4] SBCSD data does not indicate the security classification for all sentenced inmates during this time period. Some inmates were deemed ineligible to work for reasons having nothing to do with security classification or disciplinary history (e.g. some were deemed ineligible to work due to medical conditions). However, because security classification was a common reason for inmates to be deemed ineligible to work, we assume many non-work-eligible sentenced inmates were higher security risk inmates and therefore assign fewer points for time-out-of-cell (inmates with a higher security risk were less adversely impacted because they would have received less time-out-of-cell than low risk inmates had they been housed outside of the ALT).

[5] Because there is no way to distinguish from the available data, Plaintiffs' counsel have conservatively treated these inmates the same as those with 3-5 classification levels although presumably there are 6 and 7 classifications among them who would be entitled to a greater value.

| # | Per Diem Category | Disparate Conditions of Confinement | Total Per Diem Points |
|---|---|---|---|
| 6. | **Sentenced, work-eligible inmates, with <u>no</u> job assignment** | • Excluded from jobs **and** vocational training available to similarly situated non-ALT inmates. (30)<br>• Excluded from GED, high-school diploma and other educational programs available to similarly situated, sentenced inmates. (15)<br>• Excluded from alcohol/drug rehab, religious services, and volunteer worker positions available to non-ALT inmates. (20) | **65** |
| 7 | **Sentenced, work-eligible inmates, with (inferior) job assignment** | • Excluded from vocational training available to similarly situated non-ALT inmates.[6] (15)<br>• Excluded from GED, high-school diploma and other educational programs available to similarly situated, sentenced inmates. (15)<br>• Excluded from alcohol/drug rehab, religious services, and volunteer worker positions available to non-ALT inmates. (20) | **50** |
| 8 | **Sentenced inmates (not work-eligible)** | • Excluded from GED, high-school diploma and other educational programs available to similarly situated, sentenced inmates. (15)<br>• Excluded from alcohol/drug rehab, religious services, and volunteer worker positions available to non-ALT inmates. (20) | **35** |
| 9 | **Pre-sentenced inmates** | • Excluded from alcohol/drug rehab, religious services, and volunteer worker positions available to non-ALT inmates. (20) | **20** |

9.      Each class member will receive a certain number of points for each incarceration day. That class member's point total is the sum of all their daily points. The total points for each class member will then be added together, from which the class member's percentage share of the recovery can be determined. Because it is anticipated that not all class members will make Timely Claims, and this is a non-reversionary fund, a claiming class member's percentage of the Remainder will be determined based on that class member's percentage of the total points for class members who made Timely Claims. (If, for example, there was a

---

[6] Work eligible inmates were limited to the law library position, which did not include a vocational training component similar to the job assignments provided to similarly situated non-ALT inmates.

total of 1,000,000 points for the aggregated timely claims, and Class member X had a total of 2000 points, and the Remainder was $810,000, Class member X would receive .2% (or .002) of $810,000 (which is $1,620)).

10.    Despite the foregoing, no class member who filed a Timely Claim will receive less than $40 or more than a total of $10,000. The purpose of the Maximum provision is to ensure that outliers who have outsized claims do not distort the meaningfulness of the recovery to the remaining class members. (Such outliers would be entitled to opt out and pursue their own claims if they so chose.)

11.    None of the $950,000 Damages Class Fund shall revert to the County. Accordingly, as explained above, the money per class member making a Timely Claim will increase proportionately to the extent that fewer class members make a claim.

12.    The "Attorneys' Fees and Costs" is the amount of $1,100,000 as compensation for statutory fees and certain costs pursuant to 42 U.S.C. § 1988. (The costs included in this award shall include all costs incurred except for mediation costs, consultant/expert costs and Class Administration costs.) This fee shall be the subject of a separate Motion for Attorneys' Fees to be heard at the Final Approval Hearing, to be analyzed under the standards for an award of fees and costs to a prevailing plaintiff under 42 U.S.C. § 1988 and Civil Code § 52.1(h). The Class Notice will advise class members of this motion and their right to object to it.

13.    The parties agree that these fees were independently negotiated with the assistance of a professional mediator and that, in order to effectuate this settlement, the fees were substantially discounted below the amounts that Plaintiffs would have sought in an attorney's fee motion filed by Plaintiffs as the prevailing parties.

14.    The County represents that it has provided all the electronic data in its possession regarding class members necessary to both identify and contact class members. Within ten (10) days of the Court's grant of the Preliminary Approval of this settlement, the County shall provide, to the extent that such information has not

15

already been provided, any such additional information in its possession. Such information shall be confidential, and may not be disclosed to anyone except counsel of record, the Class Administrator, and designated representatives of the Parties.

## V.    INJUNCTION

15.    The Final Approval Order shall include an order granting Plaintiffs an injunction for a three-year period, after final approval by the Court of the settlement and the settlement is implemented by the County, the terms of which are set forth in Exhibit D. The injunctive relief provisions include the development of policies not yet drafted. To the extent the parties cannot agree on a policy or policies to implement the provisions of Exhibit D, the matter shall be resolved by the court.

16.    Defendants estimate that the various added resources associated with the injunctive relief changes amount to an annual expenditure of approximately $500,000 in current dollars.

17.     In the event of a change in relevant law during the three-year period that this injunction remains in effect, the County will be required to comply with any and all provisions that are more protective of class members' rights than the terms of Exhibit D.  A change in relevant law shall be defined as an amendment to the U.S. or California Constitutions, a change in federal or California statutory law, a change in applicable regulations (e.g., PREA regulations) or a binding decision of the U.S. Supreme Court, Ninth Circuit Court of Appeals, California Supreme Court, or California Court of Appeal.

18.    To the extent that Plaintiffs contend that a change in relevant law implicates the protections of paragraph 17, Plaintiffs' counsel shall notify Defendants' counsel in writing of the change in relevant law.  If the parties are unable to reach an agreement on whether there has been a change in relevant law within 30 days of the initial notification by Plaintiffs' counsel, the dispute shall be submitted for judicial review by the Court.

# VI.   OTHER SETTLEMENT TERMS

19.    The Parties enter into this agreement solely for the purposes of this settlement and implementation of the settlement. If the settlement fails to be approved or otherwise fails consummation, then this Settlement Agreement is hereby withdrawn and Defendants reserve the right to seek decertification of the class.  Any such motion for decertification would be evaluated under a de novo standard with Plaintiffs bearing the burden of establishing the requisite elements for class certification. Since Plaintiffs would bear the burden in such a motion, the parties agree that, upon notice to the Court and Plaintiffs that Defendants seek decertification of the class, the Plaintiffs would timely file a regularly noticed new motion for class certification.

20.    An SCM who complies with the requirements set forth in this Settlement Agreement and files a Timely Claim form will be paid specified sums determined by the settlement distribution process set forth above, which payment shall be in full satisfaction of all claims of that SCM.

21.    The Settlement Agreement, as of the Effective Date, resolves in full all claims against the Released Persons by all of the SCMs, including the Named Plaintiffs, involving violations of law or constitutional rights, including, without limitation, their equal protection rights under federal and California law, their rights under California Civil Code § 52.1, any other rights under any other federal, state or local law, regulation, duty, or obligation, or any other legal theory, action or cause of action, which arise from the class-wide factual allegations alleged in the complaint , as well as any claim regarding the bus transportation of transgender inmates (hereafter "Covered Claims").

22.    When the Settlement Agreement is final, as of the Effective Date, all SCMs, including the Named Plaintiffs, waive all rights to any and all claims relating to damages or reimbursement of any kind for the Covered Claims. This waiver and release shall include a full release and waiver of unknown rights regarding the Covered Claims that may exist as of the Effective Date.

17

23.     As of the Effective Date, the SCMs, including the Named Plaintiffs, hereby waive any and all rights to pursue, initiate, prosecute, or commence any action or proceeding before any court, administrative agency or other tribunal, or to file any complaint regarding acts or omissions by the Released Persons with respect to the Covered Claims during the Class Period that fit within the definition of the Damages Class; and further, as it relates to this waiver or Release, expressly waive the provisions of California Civil Code § 1542, which provides that "a general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

24.     This Settlement Agreement, together with its exhibits, contains all the terms and conditions agreed upon by the Parties regarding the subject matter of the instant proceeding, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Settlement Agreement shall be deemed to exist, or to bind the Parties, or to vary the terms and conditions contained herein, except as expressly provided herein.

25.     Each SCM shall be deemed to have submitted to the jurisdiction of the Court.

26.     This Settlement Agreement is subject to and conditioned on a Final Approval Hearing conducted by the Court and the final approval of this Settlement Agreement and the issuance of the final order and judgment of dismissal by the Court, providing the specified relief as set forth below, which relief shall be pursuant to the terms and conditions of this Settlement Agreement and the Parties' performance of their continuing rights and obligations hereunder. The Order and Judgment shall be deemed final on the Effective Date as defined previously. Such Final Order and Judgment shall:

a. Dismiss with prejudice all claims in the action as to the Released Persons including all claims for monetary damages, declaratory relief and injunctive relief, except as to the terms of the injunction to be entered,

which terms are set forth *infra*, each side to bear its own costs and fees except as otherwise provided for in this Settlement Agreement;

b. Order that all SCMs are enjoined from asserting against any Released Person any and all claims that any SCM had, has or may have in the future arising out of the facts alleged in the Complaint;

c. Release each Released Person from the claims that any SCM has, had or may have in the future against such Released Person arising out of the facts alleged in the Complaint;

d. Determine that this Settlement Agreement is entered into in good faith, is reasonable, fair and adequate, and in the best interest of the Class; and

e. Reserve the Court's continuing and exclusive jurisdiction over the Parties to this Settlement Agreement, including Defendants and SCMs, to administer, supervise, construe and enforce the Settlement Agreement in accordance with its terms for the mutual benefit of all Parties, and to enforce the terms of the injunction described *infra*.

The Parties will take all necessary and appropriate steps to obtain preliminary and final approvals of the Settlement Agreement, and dismissal of the action with prejudice, all parties bearing their own fees and costs unless otherwise set forth in this Settlement Agreement. If the Court gives final approval of this Settlement Agreement, and if there is an appeal from such decision, the Parties will defend the Settlement Agreement.

## VII. RESOLUTION AND PAYMENT OF CLAIMS

27. Released Parties shall not prefund the Settlement Fund. Instead, funds will be deposited by the Released Parties to the Class Administrator as necessary to pay the class administration costs, and the SCMs (including the Named Plaintiff) claims. (Attorney's fees and costs are addressed separately.)

28. Defendants agree to the division of funds between Incentive Awards and the Remainder as proposed by Plaintiffs' Counsel subject to the approval of the Court.

29.     The County of San Bernardino will make a single wire transfer to the Class Administrator of the Damages Class Fund, less the amount of that Fund previously advanced under the terms of this Agreement. This transfer shall be made within ten (10) days of the Effective Date of the Settlement.

## VIII.  PAYMENT OF CLASS COUNSEL FEES

30.     In addition to and separate from any other payments called for in this Agreement, the County of San Bernardino shall pay a one-time-only lump sum payment of the Class Counsel attorneys' fees plus litigation costs (exclusive of expert/consultant and mediation fees, which are paid from the $950,000 Damages Class Fund) in the amount of $1,100,000, payable by wire transfer to the KMBL Client Trust Account within ten (10) days after the Effective Date of the Settlement. This payment represents a full and final settlement of all past, present and future attorneys' fees and all past, present and future ordinary and extraordinary costs. Class counsel will file a Motion for Attorney's Fees and Costs, and the payment of said fees and costs is subject to court approval. Defendants agree that Plaintiffs satisfy the prevailing party element for such a motion.

## IX.    CLASS ADMINISTRATION COSTS

31.     Requests for bids were sent to established Class Administrators (KCC, CPT Group, and JND Legal Administration), and were to be chosen by Class Counsel based upon assessing the most reasonable bid, taking into account the combination of the price and scope of the services provided, and the capabilities and reputation of the Administrator.  (That has now occurred, and Plaintiffs' counsel has chosen JND based on the conclusion that it was the most reasonably priced.)

32.     The Administrator shall be responsible for providing Class Notice. This duty shall comprise mailing Class Notice and a Claim Form by regular mail to all Class Members' last known address. The Administrator shall also use normal and customary means to search for a Damages Class Member's last known address, including the use of a postal database, when mail is returned, or do whatever else is

reasonably appropriate in order to reasonably notify Class Members (including making reasonable efforts to determine class members who are now incarcerated in California state prisons). Class Counsel may also take whatever steps they deem appropriate to notify the Class Members of their rights to file claims and to assist them in doing so. The Summary Notice will also be posted by the Defendants in the ALT throughout the Class Notice period, including a statement that the full notice will be provided to the inmate upon request.

33. The Class Administrator will include in its bid a line item for the cost of obtaining from California Department of Corrections and Rehabilitation the identities of class members in CDCR custody to whom notices should be sent at their CDCR housing location.

34. The Class Notice shall describe the particulars of the case, provide the class definition, provide information for claimants to contact the Administrator for a claim form, notify Damages Class Members of establishment of a case website, and contain other usual and customary information. The proposed Class Notice is attached to this Settlement Agreement as Exhibit B.

35. The Administrator shall complete the mailing of Class Notice within two consecutive business days. The second day of such mailing is the first day of the period for calculating the "Bar Date" (defined previously). That mailing shall occur as soon as practicable after the settlement has been preliminarily approved no later than the date set by the Court.

36. In lieu of publishing a summary Class Notice in local newspapers as a form of reaching class members who do not receive the mailing, which experience has shown does not effectively reach class members, the Administrator shall gather email addresses to the extent reasonably possible and cost effective. Given the relatively small size of the class (655 people), the Class Administrator shall propose other cost-effective means of outreach.

X. **CLASS ADMINISTRATION FOR PROOF OF CLAIM FORMS**

37. The Administrator shall be responsible for providing and receiving

Proof of Claim Forms. The Administrator shall determine class membership and the amount of Damages due each timely claiming class member based on the formula contained in Section IV.

38.     A Proof of Claim Form shall be deemed timely submitted under subsection (a) of Definition # 30 (Timely Claim) when received by the Administrator, or postmarked, on or before the Bar Date. Facsimile or electronic mail filings are acceptable and timely so long as they clearly indicate the case on which the claim is filed and are received on or before the Bar Date.

39.     If a Damages Class Member submits a Claim form that is deficient in some respect, the Administrator shall provide written notice by First Class Mail and a 30-day time limit to provide a proper claim form, which notice shall inform the Class Member of what s/he must do in order to submit a proper claim. Failure to cure the deficiency within the 30-day time limit will bar any further rights for consideration of eligibility. So long as the original claim is received on or before the Bar Date, it shall be considered timely under sub-section (a) of Definition # 30 (Timely Claim) if any deficiency is cured within 30 days of the mailing of a notice of deficiency.

40.     Claim Forms received after the Bar Date shall be processed by the Administrator and paid as ultimately ordered by the Court. The Administrator will notify claimants of the rejection of untimely Claims.

41.     The Administrator shall make payments to SCMs who have filed Timely Claims as ultimately determined by the Court in accordance with this Settlement Agreement within a reasonable time not to exceed 90 days after the Effective Date.

42.     If a check to an SCM is not cashed within three months of its mailing, the Administrator shall hold the funds for nine additional months, during which time it shall make reasonable efforts to contact the person to whom the uncashed check was written to make arrangements for its cashing or reissuance. The Administrator shall not make payment to any SCM until all claims have been

submitted to the Administrator pursuant to the terms of this Settlement Agreement. Any such funds not cashed within one year of the check's initial mailing shall be distributed pro rata to SCMs whose checks were cashed. If there are remaining funds after that second round of distribution, they shall be given as a *cy pres* donation to Inland Region Equality Network.

## XI.                    EXCLUSION FROM SETTLEMENT CLASS—OPT OUTS

43.     Any Damages Class Member who wishes to be excluded from the Settlement Class must submit a request to be excluded from the class, a process defined herein as "Opt-Out." The request for exclusion must be delivered to the Administrator, or postmarked, on or before the Bar Date or as the Court may otherwise direct.

44.     Each member of the Settlement Class who chooses to Opt-Out from or object to this settlement shall be deemed to have submitted to the jurisdiction of the Court with respect to his/her claim and to any dispute resolution process conducted by a Special Master as set forth in this Settlement Agreement.

45.     Any Class Member who does not Opt-Out as set forth in this Settlement Agreement, shall be deemed conclusively to have become an SCM and to be bound by the Settlement Agreement and all subsequent proceedings, orders and judgments herein, regardless of whether s/he files a claim form.

46.     Any Class Member who exercises an Opt-Out shall not share in any monetary benefits provided by this Settlement Agreement.

47.     The Administrator will periodically report to Defendants' counsel and Class Counsel all Opt-Outs received, and will determine and report to counsel the total number of Opt-Outs no later than 10 days after the Bar Date.

48.     In the event that the number of Opt Outs exceeds ten (10) but is less than twenty-five (25), i.e., where the number of Opt Outs is between 11-24, the parties agree that, Defendants will receive a credit against the Class Damages Fund based on the amount that each Opt Out was due under the initial class distribution formula (explained in ¶ 8) when applied to the Damages Class and as calculated by

Plaintiffs' counsel, i.e., the amount due that class member if all class members filed claims. (To the extent that the final distribution formula results in different allocations because not all class members filed claims, the credit would be based on the initial distribution formula, not the formula adjusted to the claims made.) This credit is only available if the number of Opt Outs exceeds ten.

49.     If the number of Opt Outs amounts to 25 or more or if any Named Plaintiff opts out, Defendants shall have the option of using the same credit formula as set out in the previous paragraph where the number of Opt Outs is between 11-24, or of rescinding the Agreement.

50.     If Defendants decide to exercise their this right of rescission as provided in the previous paragraph, Defendants shall provide the Administrator and Class Counsel with written notice of rescission within 20 days after receipt of the Administrator's report providing the total number of Opt-Outs. In the event Defendants exercise the right of rescission, any funds paid or deposited pursuant to this Settlement Agreement shall be returned to Defendants within 10 days of the rescission, less any expenses, fees and costs incurred by the Administrator. Rescission shall return the Case to active litigation status.

## XII.   APPROVALS REQUIRED

51.     The San Bernardino County Board of Supervisors and the surviving Named Plaintiffs have all approved this settlement.

## XIII.  DISPUTE RESOLUTION

52.     In the event of any disputes regarding implementation of the Settlement Agreement as set forth herein, they shall be resolved by the Court.

## XIV.  INTEGRATION

53.     This Settlement Agreement supersedes all prior communications regarding the matters contained herein between the Parties or their representatives. This Settlement Agreement is an integrated agreement and contains the entire agreement regarding the matters herein between the Parties, and no representations, warranties or promises have been made or relied on by any party hereto other than

as set forth herein. This Settlement Agreement was drafted by counsel for the parties hereto, and there shall be no presumption or construction against any party.

## XV.   FAIRNESS HEARING AND FINAL ORDER OF APPROVAL

54.     Before this settlement agreement becomes final and binding on the Parties, the Court shall hold a Fairness Hearing to determine whether to enter the Final Order of Approval. A proposed Final Order of Approval shall be submitted to the Court incorporating the terms of this Settlement Agreement and addressing related information such as Objections and Opt-Outs.

## XVI.  NO THIRD PARTY BENEFICIARIES INTENDED

55.     This Settlement Agreement does not and is not intended to create any rights with respect to any third parties, except as otherwise provided herein.

## XVII. COUNTERPARTS

56.     This Settlement Agreement may be signed in counterparts.


DATED: August 13, 2018              KAYE, MCLANE, BEDNARSKI & LITT
                                    ACLU FOUNDATION OF SOUTHERN CALIFORNIA

                                    By: _/s/ Barrett S. Litt_____
                                        Barrett S. Litt
                                        Attorneys for Plaintiffs


DATED: August 13, 2018              BURKE, WILLIAMS & SORENSEN

                                    By: _/s/ Nathan A. Oyster_____
                                        Nathan A. Oyster
                                        Attorneys for Defendants

LIST OF EXHIBITS TO SETTLEMENT AGREEMENT

Exhibit B   Class Notice

Exhibit C   Proof of Claim and Release Form

Exhibit D   Injunctive Relief Agreement

Exhibit E   JND Class Administration Bid

**Exhibit B**

1. **PREA-GBTI COMMITTEE**

   1.1. <u>Purpose</u>.  The SBSD will operate a PREA-GBTI Committee ("the Committee") whose purpose is to discuss the housing assignment, programming options, educational options, and employment options for inmates who self-identify as a GBTI inmate.

   1.2. <u>Frequency</u>.  The Committee shall meet two times per month, subject to modification as needed.  The default Committee schedule shall call for two regularly-scheduled meetings per month.  At each meeting, the Committee shall conduct a review of the available housing, programming, education, and employment for all eligible inmates as defined in Section 1.4.

   1.3. <u>Committee Members</u>.  The Committee shall consist of seven representatives at each meeting, subject to excused absences.

     1.3.1.  Facility commander or designee;
     1.3.2.  Representative from Centralized Classification Unit / Population Management Unit;
     1.3.3.  Medical supervisor or designee;
     1.3.4.  Mental health supervisor or designee;
     1.3.5.  Representative from Inmate Services Unit (Programs/Education);
     1.3.6.  PREA/GBTI compliance manager; and
     1.3.7.  County-employed social worker with knowledge of issues impacting the GBTI community, who shall act as a GBTI advocate.

   1.4. <u>Inmates Subject To Review</u>.  At each meeting, the Committee shall review the housing, programming, education, and employment for the following eligible inmates:

     1.4.1.  All inmates who have been booked into the SBSD jails since the preceding Committee meeting and who have self-identified as GBTI.
     1.4.2.  All self-identified GBTI inmates who have been sentenced since the preceding Committee meeting.
     1.4.3.  If an inmate who would otherwise qualify as eligible under Section 1.4.1 opted to be housed outside of the designated GBTI housing location upon initial booking, the inmate has the option of requesting a review from the Committee and shall be so informed.  Absent such a request, the Committee shall not conduct a review of a self-identified GBTI inmate who chose to be housed outside of the designated GBTI housing upon booking.

   1.5. <u>Committee Functions</u>.  At each meeting, the Committee shall perform the following functions:
     1.5.1.  The Committee will meet with all eligible-inmates as defined by Section 1.4.

1.5.2. The Committee will review the initial classification and intake forms for accuracy.

1.5.3. The Committee will ensure that GBTI inmates understand that housing in the GBTI unit is one of many housing options and that SBSD is committed to ensuring their safety throughout the facility, regardless of whether they opt to be housed in the GBTI unit or general population. SBSD shall take steps discussed with Plaintiffs' counsel to improve safety throughout the facility, including in general population and during transport, so GBTI inmates are safe in general population and any other housing or location. Potential changes could include housing GBTI individuals in general population cells closest to front the front of units where most accessible and visible to deputies and custodial assistants, managing blind spots, increased cameras and other steps that effectively counter risk of assault.

1.5.4. The Committee will ensure that GBTI inmates are fully informed of their housing options, available programming, and work assignments.

1.5.5. The Committee will formally discuss, evaluate, and make decisions on inmate housing assignments. The Committee will take into consideration any specific request from the GBTI inmate to ensure they feel safe and fully understand the consequences of a specific housing location. The inmate request will not be dispositive but will be given serious weight.

1.5.6. The Committee will identify the most appropriate housing location for transgender and intersex inmates. The housing assessment will be individualized and gender identity will be taken into consideration. Housing based upon and consistent with gender identity will be discussed and evaluated as a housing option.

1.5.7. The Committee will also discuss and manage issues of searches, shower privacy, transition-related care as discussed in Section 7. The parties will work together to create a form that will capture information about the person's gender identity, appropriate name and pronoun, preferences as to the gender of the person(s) who search them, housing preferences, and cellmate preferences, if any.

1.5.8. The Committee will evaluate and make decisions for GBTI inmates specifically related to work assignments (if applicable) and available program/education opportunities.

1.5.9. The Committee will identify, evaluate, and monitor any ongoing mental health or medical care issues or concerns.

1.5.10. The Committee will endeavor to come to a consensus but the Facility Commander will have ultimate decision-making authority. The Committee will maintain notes of these meetings. The Committee will document any disagreements over the housing/programming plan, and document any rationale for housing a GBTI inmate in housing different than their preferred choice. The inmate will be informed of the Committee's decisions and disagreements in a manner that allows the inmate to grieve the Committee's decision.

1.5.11. The Committee will review GBTI grievances that deal with housing, programs, work assignments or other confinement issues. The Committee shall not review any grievance that alleges misconduct on behalf of staff. Those grievances shall continue to be investigated and reviewed by the commander or designee.

## 2. HOUSING & CLASSIFICATION ISSUES

2.1. <u>Renaming Unit</u>.  The housing location at West Valley Detention Center currently known as the Alternative Lifestyle Tank ("ALT") shall be renamed the GBTI unit.

2.2. <u>Range of Housing Options</u>.  Inmates who self-identify as GBTI shall have the following housing options:

    2.2.1.   General population, based on classification score;

    2.2.2.   GBTI Unit at WVDC, based on classification score;

    2.2.3.   For transgender and intersex inmates, housing based upon and consistent with gender identity, if approved by the PREA-GBTI Committee (for the period of time commencing with the meeting specified in Section 1.4.1 of this Agreement) or the Centralized Classification Unit (CCU) (for the period of time prior to the meeting specified in Section 1.4.1 of this Agreement).

    2.2.4.   Protective Custody housing, if the inmate needs protection from other inmates based on protective custody protocol and for reasons other than their sexual orientation or gender identity.

2.3. <u>Factors to Consider</u>.  The following factors shall be considered in determining the housing assignment of a GBTI inmate:

    2.3.1.   Individual determination of safety with the jail, unit or segment;

    2.3.2.   Taking into consideration the inmates own view of safety and a housing location, which will be given serious weight;

    2.3.3.   The location that maximizes access to program, work or other activities;

    2.3.4.   GBTI  inmates will not be automatically assigned to the GBTI unit, protective custody or restrictive housing;

    2.3.5.   The PREA/GBTI committee will review and approve housing locations; and,

    2.3.6.   The SBSD reserves the right to relocate any inmate(s) based on construction, inmate population needs, changes in classification, medical/mental health concerns, etc. In other words, SBSD does not guarantee that all GBTI inmates will be housed in one specific location (e.g. Unit One). They could be moved to other units as necessary. There will remain a GBTI unit unless this agreement is modified.

## 3. INMATE WORKER OPTIONS

3.1. <u>Eligibility</u>.  Nothing in this proposal shall alter the standard requirements for inmate worker-eligibility.  This agreement shall only impact inmates who self-identify as GBTI and whose housing location in the GBTI unit may have been the sole basis for making them ineligible for employment.

3.2. <u>GBTI Inmates in Standard General Population</u>.  GBTI inmates who are housed in standard general population housing shall be eligible for jobs without regard to their GBTI status.

3.3. <u>Inmates in the GBTI Unit</u>.  Inmates housed in the GBTI Unit at WVDC who are otherwise-eligible for and selected for an assignment can become inmate workers in one of two ways:

   3.3.1.  An inmate in the GBTI Unit who has requested an inmate job can remain living in the GBTI Unit while on a wait list and then transfer to a work-based housing assignment once selected for an inmate job. Alternatively, an inmate in the GBTI Unit who is work-eligible can choose to remain the GBTI Unit and opt to be matched with an inmate job that has been approved for inmates in the GBTI Unit.

   3.3.2.  Pursuant to Policy 13.170, inmate workers are housed in inmate worker units. Staff will ensure that the GBTI inmate understands the following.  The request must come from the inmate.  There is no actual guarantee of a specific job, as there are very few jobs available based on the inmate population. GBTI inmates will have to wait for a job opening just like non-GBTI inmates. The Committee will inform inmates who are eligible to work of the jobs available and the current wait list and location of those jobs.  The wait list is determined in chronological order of an inmate's application to the wait list when work eligible. The length of the wait list shall be shared with the inmates, and there will be different wait lists for different jobs so that there is an informed choice as to whether to go on one with a long wait list.

   3.3.3.  The SBSD will ensure that a minimum of three jobs for inmates who elect to remain in the GBTI unit can be accommodated at a given time.  In addition to the law library position, the SBSD will identify and select two additional jobs that can be provided to eligible inmates from the GBTI Unit. Should a situation arise where more than three GBTI unit inmates need a job at the same time, the SBSD will in good faith attempt to identify and fill the additional jobs.

   3.3.4.  All inmate workers must adhere to facility guidelines for job assignments.  The PREA-GBTI Committee will coordinate and ensure that GBTI inmates are afforded every opportunity and equal access to a work assignment with the understanding that no inmate is guaranteed a job.

   3.3.5.  GBTI inmates will have the same opportunities to have volunteer positions as other general population inmates at WVDC.

3.4. <u>Job Postings</u>.  In addition to the information provided to GBTI inmates during their meetings with the PREA-GBTI Committee, the SBSD shall post information about inmate jobs.

3.5. <u>Credits</u>.  Any sentencing credits will be rewarded without regard to sexual orientation, gender identity, or housing placement in the GBTI Unit.

3.6. <u>Work and HIV Status.</u> The SBSD policies do not discriminate based on HIV status. Therefore, HIV status does not disqualify an otherwise-eligible inmate from working.

4. **PROGRAMMING**

4.1. <u>In-Person.</u>  If an in-person program is offered to inmates at Glen Helen or general population at WVDC, then that program will be offered in the GBTI Unit or a suitable classroom at WVDC.  Courses offered at WVDC will use the same eligibility, pre-requisites, and scheduling rationale used at GHRC.  Courses offered at WVDC will use the same eligibility, pre-requisites, and scheduling rationale used at GHRC.

4.2. <u>Remote Access.</u>  If a program is offered via remote access (such as online, journalist, or tablets) to inmates at Glen Helen or other general population units at WVDC, the inmates in the GBTI Unit at WVDC will also be eligible to participate in the program via remote access.

4.3. <u>Religious Providers.</u>  The SBSD will work with Plaintiffs in an effort to find security-eligible religious providers who are willing to provide religious services in the GBTI Unit and will provide chaplains and group religious services in the same manner they do for other general population units at WVDC, including possible services in spaces outside of the day room.

4.4. <u>Credits.</u>  Any sentencing credits for programming, including drug rehabilitation or any other program for which credit is given by the Court or SBCJ will be rewarded without regard to sexual orientation, gender identity, or placement in the GBTI Unit.

4.5. <u>Programming and HIV Status.</u>  The SBSD policies do not discriminate based on HIV status.  Therefore, HIV status does not disqualify an otherwise-eligible inmate from programming.

5. **GBTI UNIT TIER TIME**

5.1. <u>Two Segments.</u>  Provided that a minimum of 20 inmates opt to be housed in the GBTI Unit, then the GBTI Unit will be divided into two segments.

5.2. <u>GP-3 to GP-5.</u>  One segment of the GBTI Unit shall consist of inmates with classifications of GP-3, GP-4, and GP-5.  Inmates in this segment shall receive half tier time. If in the future general population inmates with classifications of GB-3, GP-4, and GP-5 start receiving more than half tier time, then similar increases will be applied to the GBTI Unit with GP-3, GP-4, and GP-5 inmates.

5.3. <u>GP-6 to GP-7.</u>  One segment of the GBTI Unit shall consist of inmates with classifications of GP-6 and GP-7.  Inmates in this segment shall receive full tier time.

5.4. <u>Contingency for Single Segment</u>. Should the population of the GBTI Unit fall below 20 inmates, the SBSD reserves the right to consolidate the GBTI Unit into a single segment. If the GBTI Unit is consolidated into a single segment under this provision, the Watch Commander or his/her designee can decide to give less tier time based on security considerations and the classification scores of the inmates in the GBTI Unit but no less than half tier time. The Watch Commander or his/her designee can also decide to keep tier time at the same level in their discretion. The decision will be documented.

5.5. <u>Exceptions</u>. Any exception to the default tier time designated in Sections 5.2, 5.3, and 5.4 must be approved by the Watch Commander and must be documented in the shift log.

5.6. <u>Recreation Time</u>. All inmates in the GBTI Unit shall receive outside recreation time as required by Title 15.

## 6. Training

6.1. <u>Staff Training</u>. The SBSD will provide comprehensive training for staff, contractors, and volunteers who have contact with inmates on GBTI and PREA issues prior to the assignment of the staff, contractor, or volunteer to any position involving contact with inmates.

6.2. <u>Training Topics</u>. The mandatory training shall cover the following topics at minimum:

6.2.1. The Prison Rape Elimination Act;
6.2.2. The department's zero tolerance policy regarding sexual abuse and sexual harassment;
6.2.3. Common reactions of sexual abuse and sexual harassment victims;
6.2.4. Detection and response to signs of sexual abuse;
6.2.5. Inmates right to be free from sexual abuse and sexual harassment;
6.2.6. Inmates and staff members right to be free from retaliation when reporting sexual abuse or sexual harassment incidents;
6.2.7. How to effectively and professionally communicate with inmates including lesbian, gay, bisexual, transgender, intersex or gender non-conforming inmates (LBGTI);
6.2.8. How to comply with all relevant laws related to mandatory reporting of sexual abuse to outside authorities;
6.2.9. Impact of discrimination against LBGTI inmates; and
6.2.10. Classification, housing, programming, education, work opportunities and integration of LBGTI inmates in the prison setting.

6.3. <u>Refresher Training</u>. All staff, contractors, and volunteers shall receive refresher training on the issues described in Sections 6.1 and 6.2 at least once every two years.

6.4. <u>Training Records</u>. Initial and refresher training shall be documented using the Acknowledgment of PREA training form. Training compliance records will be computerized.

6.5. <u>Educating Inmates</u>. Materials designed to educate inmates on GBTI and PREA issues shall be made available to all inmates in the jail system. The materials shall identify the SBSD's zero tolerance policy regarding sexual harassment and how to report incidents or suspicion of sexual abuse or sexual harassment. Inmates shall receive this information during the intake process. Information will be posted in housing areas and readily visible to inmates. Plaintiffs' counsel will endeavor to work with experts to obtain quality videos and materials to be used for inmate education, which will be provided to the SBSD. Absent an articulable objection from the SBSD to the materials provided by Plaintiffs' counsel, the SBSD will provide these materials to the inmates during orientation and make these materials available for viewing by all inmates at other appropriate times.

7. **TRANSGENDER ISSUES**

7.1. <u>Orientation</u>. It is understood that the appropriate correctional approach to the housing and protection of transgender inmates is a relatively new and rapidly developing area of both correctional practices and the law. San Bernardino County Sheriff's Department is committed to an ongoing assessment of the special needs and best correctional practices for transgender inmates, and to developing appropriate policies to address those issues.

7.2. <u>Housing</u>. Transgender women and intersex people assigned to men's facilities shall be housed based upon the recommendation of the PREA-GBTI Committee, considering the range of housing options in Section 2.2 and the factors in Section 2.3. Plaintiffs and SBSD will discuss, in developing this policy, whether the same range of housing options and process should be made available to transgender men, whether assigned to men's or women's facilities.

7.3. <u>Searches</u>. Transgender and intersex inmates shall advise the PREA-GBTI Committee of the preferred gender for deputies who will perform searches of the inmates. The SBSD shall honor the inmates' request subject to certain narrow exceptions that shall be identified in a written policy. Plaintiffs will work with SBSD to devise a specific question or gender preference search form.

7.4. <u>Shower Privacy</u>. Transgender and intersex inmates will have the opportunity to shower, perform bodily functions, and change clothes in private, away from the view of other inmates and cross-gender, non-medical staff (staff with a gender different than the gender the inmate identifies as). This may be accomplished through housing and classification, shower curtains, privacy screens, or other methods.

7.5. <u>Medical Issues</u>. Correctional Health Services staff including Qualified Mental Health Professionals shall assess, diagnose, and establish a documented individual treatment plan for inmates including, but not limited to, those inmates identified with DSM diagnosis Gender Dysphoria. Qualified Mental Health Professional Providers shall order treatment as clinically indicated including, but not limited to, gap hormone medication.

7.6. <u>Transport</u>. Transgender inmates will not be cuffed, tied or otherwise placed in immediate proximity to inmates of a different gender identity during transport, including but not limited to bus transport to and from court. Transgender inmates who so request will be transported, if feasible, in individual protective 'cages,' or, where that is not feasible, will be accorded special protections to ensure that they are not harmed by other inmates during transport.

## 8. GENERAL PREA ISSUES

8.1. <u>Zero Tolerance Policy for Harassment.</u>

   8.1.1.  SBSD policy and employee bulletins will clearly prohibit harassment and discrimination against GBTI inmates or those perceived to be GBTI. This policy will have zero tolerance for anti-LGBTIQ statements in SBSD facilities. Deputies shall be subject to discipline for committing harassment and discrimination, including name calling.

   8.1.2.  SBCSD will have a zero tolerance policy regarding the intentional misgendering of transgender and intersex inmates by staff. All staff will use the name and pronouns specified by the transgender or intersex inmate. Consistent use of the incorrect name and pronoun will be considered and handled as sexual harassment. Nothing in this section shall prohibit medical staff from complying with regulations or laws governing the dispensing of pharmaceuticals and the use of an inmate's legal name.

8.2. <u>PREA Pre-Audit</u>. Within six months of the Court's final approval of the settlement, the SBSD agrees to conduct a PREA pre-audit at West Valley Detention Center using a trained PREA auditor, based on a list of approved auditors provided by the United States Department of Justice. Following the pre-audit, the SBSD will meet and confer with Plaintiffs' counsel regarding the findings, and what actions taken by SBSD based on the findings. The SBSD shall conduct an assessment addressing the issues identified in the PREA pre-audit after the meet and confer and will inform Plaintiffs' counsel of actions taken in response to the pre-audit and the meet and confer. Nothing in this agreement shall impose an affirmative obligation on the SBSD to comply with the recommendations of the PREA pre-audit. Nothing in this agreement shall require the SBSD to allow the auditor to review or access materials protected under California law by California Penal Code § 832.5 *et. seq*. or California Evidence Code § 1040 *et. seq*. The pre-audit will not be forwarded to the United States Department of Justice. However, nothing in this agreement shall limit Plaintiffs' counsel's ability to report any PREA violations that are not rectified by the SBSD in response to the pre-audit or any future violations of PREA.

8.3. <u>Hotlines</u>.  The SBSD agrees to have working and anonymous PREA hotlines.

8.4. <u>Victim Counseling</u>.  Mental health counseling, by counselors trained   in rape and sexual assault consistent with PREA regulations 115.53 and 115.82-83, shall be available for all inmate victims of sexual assault.

8.5. <u>Not Relocating Victim</u>.  Following the reporting of a sexual assault in the jails, the general rule is that the victim of the assault shall not be moved to another housing location.  Instead, the alleged perpetrator shall be moved to another housing location.  Exceptions to this general rule shall exist.  Victim inmates may be moved out of a housing segment for his/her own protection.  Victim inmates shall be reassessed for a different housing assignment by the Central Classification Unit (CCU) and/or PREA-GBTI Committee.

8.6. <u>Screening</u>.  The SBSD shall continue PREA screening.  The SBSD recognizes that not all GBTI inmates should be designated as PREA-vulnerable.  The parties will jointly develop an appropriate screening mechanism that will be utilized by the PREA-GBTI Committee to facilitate appropriate housing, work and programming choices.

8.7. <u>Compliance Manager</u>.  All type II jail facilities that house GBTI or PREA-vulnerable inmates will have a PREA-GBTI compliance manager.  The compliance manager shall be responsible for the facility's efforts to comply with PREA-GBTI policies and procedures. The PREA-GBTI compliance manager shall be responsible for and ensure compliance with the Bureau Polices. The PREA-GBTI Compliance Manager shall also serve on the PREA-GBTI Committee.

8.8. <u>PREA Requirements</u>.  Nothing in this agreement shall otherwise alter any PREA requirements that may be applicable to SBSD.

## 9.  ENFORCING THE AGREEMENT

9.1. <u>Policies</u>.  The parties will negotiate the language of any SBSD policies that shall be necessary to implement this agreement.

9.2. <u>Production</u>.  For three years after the Court's final approval of the agreement, the SBSD shall produce the following documents on an annual basis:

   9.2.1.   A computerized spreadsheet that lists all initial and refresher training courses presented to staff, contractors and volunteers as well as a copy of each unique training. The spreadsheet will document the date of each course and compliance with section 6.2 (Training topics). The spreadsheet will certify that all required personnel are in compliance pursuant to this injunctive relief item.

   9.2.2.   A computerized spreadsheet that lists the housing locations for all inmates who openly identify during classification as GBTI.

9.2.3.  A computerized spreadsheet that lists all inmates housed in the GBTI segments. The spreadsheet shall include the inmates full name, booking number, classification rating, arrest date, sentencing date (if applicable), release date, and housing location.

9.2.4.  A computerized list of all educational, vocational, rehabilitation or other programming courses during the year provided to general population inmates.

9.2.5.  A computerized list of all inmates housed in the GBTI segments who requested and also who received educational or programming courses during the year. The list shall contain the type of educational or programming course, date, etc.

9.2.6.  Copies of the individual inmate PREA-GBTI Committee forms (includes housing options for each inmate).

9.2.7.  Computerized list of GBTI inmates who requested jobs and also a computerized list of GBTI inmates who are inmate workers and their job. This includes inmates housed in the GBTI segments and those who transferred to general population.

9.2.8.  Annual average of tier time afforded to inmates housing in the GBTI segments.

9.2.9.  Annual report that provides statistics on sexual assault and sexual harassment of inmates.

9.2.10. Nothing in this section shall require the SBSD to provide materials protected under California law by California Penal Code § 832.5 *et. seq.* or California Evidence Code § 1040 *et. seq*.

9.3.  <u>Meet and Confer</u>.  The parties will meet and confer before any party seeks judicial enforcement of the settlement agreement.

9.4.  <u>Expense</u>.  All parties shall be responsible for their own costs and fees incurred after the Court's final approval of the settlement; except that if the Court finds a material violation or issues a remedial order, Plaintiffs will be entitled to fees.